STATE OF IOWA v. E. P. JOHNSON, Appellant.

**Attorney and client:** COMPOUNDING FELONY. The agreement of an attorney not to prosecute a criminal charge in the event of a satisfactory settlement of a civil action for damages is illegal.

**Same:** UNCONSCIONABLE CONTRACTS.  Contracts between attorney and
client will be closely scrutinized and the attorney will not be per-
mitted to abuse the trust and confidence reposed in him by taking
an unconscionable advantage of the client.

**Same:** DISBARMENT.  In this disbarment proceeding the evidence is
reviewed and held to show that defendant was guilty of extortion,
of compounding a felony and other improper conduct warranting
his disbarment.

*Appeal from Winneshiek District Court.*—HON. A. N.
HOBSON, Judge.

TUESDAY, DECEMBER 13, 1910.

PROCEEDINGS to disbar the defendant.  There was a
judgment revoking his license to practice law, and he ap-
peals.—*Affirmed.*

*E. W. Cutting* and *Perry S. Johnson,* for appellant.

*N. Willett, Frank Sayre,* and *C. N. Houck,* for the
State.

SHERWIN, J.—Ten accusations were made against the
defendant, and seven of them were sustained.  The first
charged extortion and dishonesty in connection with his
employment by Mrs. Martha Haukedahl, and was based on
the following facts:  Mrs. Haukedahl was a widow sixty-
four years old who supported herself by manual labor.  Her
son had been killed on the track of the Chicago, Milwaukee
& St. Paul Railway Company, and in April, 1909, she
wrote the company in relation to his death and her claim
for damages on account thereof.  The company answered
this letter denying liability, but offering to pay her $250
as a matter of charity if she would release all further claim,
etc.  Acting on the advice of a friend, Mrs. Haukedahl
went to the defendant with this letter and employed him

to secure a better settlement with the railway company, if possible. The defendant lived in Decorah, and Mrs. Hauke-dahl in Calmar, and about a week after Mrs. Haukedahl's visit to him the defendant called on her at her home in Calmar and secured from her $350 in cash for his prospective services. He at that time gave her a receipt which recited that the money was received as a retainer "to make an effort to get settlement" with the railway company. About a week still later, the defendant passed through Calmar on his way to Chicago, and while there he induced Mrs. Haukedahl to sign an agreement employing him "to consult the proper officers" of the railway company "for the purpose of effecting a compromise" for damages, and, as compensation for services rendered and to be rendered in compromising said damages, the said party of the first part hereby agrees to pay as a retainer therefor the sum of $350. The contract further provided that Johnson should go to Chicago to consult the company's claim agent, and that the retainer was paid for services and expenses in "attempting to compromise and settle, . . . whether anything can be obtained on compromise and settlement or not." The contract expressly provided that no action for damages was to be commenced for the retainer paid, and that Johnson might settle for any amount he liked and bind Mrs. Haukedahl by his receipt therefor. A short time after this contract was signed, the railway company, through its claim agent, in a letter sent to Johnson, offered to pay Mrs. Haukedahl $600 in full settlement of her claim. She accepted the offer and received the money, and the defendant kept the $350 that he had received from Mrs. Haukedahl.

The demand for $350 in advance of services performed and the contract were unconscionable. The rapacity of the defendant in dealing with this woman is unparalleled, except by another one of his alleged contracts to which we shall again refer later on in this opinion. Mrs Haukedahl

is a Norwegian woman with but an imperfect understanding of the English language. In fact, she went to the defendant for legal advice and assistance because of the fact that he talked and understood her native language and because of her inability to speak and understand English. She knew nothing of legal procedure, or of legal terms, and did not understand the import and meaning of the receipt given her for the $350, nor did she understand the contract that she afterwards signed. This contract gave the defendant absolute power to settle for any sum, and it provided that he should keep the money already paid to him, no matter whether he secured a dollar from the company or not. As a matter of fact, the defendant secured from his client and retained $350 for getting her $250, the amount that had already been offered her by the company. The appellant says that the charge can not be sustained because no demand was made on him, as provided by Code, section 330. The section cited has no applicability to a transaction of this kind.

The facts concerning the second accusation against the defendant are as follows: He was employed by Gertrude Neshcim to represent her in a settlement and an accounting between herself and Nels B. Lee, both Norwegians. The defendant spent a part of a day.in bringing about a settlement. When it was agreed upon, Gertrude Nesheim executed a written promise to pay Lee $500 within a short time thereafter, which agreement the defendant retained in his possession without any authority for so doing. The amount was soon thereafter left with Johnson to be paid over to Lee. Johnson deducted $50 therefrom for his services against the earnest protest of Lee and gave Lee the rest of the money. Johnson also charged Gertrude Nesheim $100 for his service in the same transaction. That Lee had not employed the defendant, and that the defendant did not in any way represent him in the transaction or settlement, is clear. It is equally as clear that the defend-

ant took the note without authority from Lee; that it was voluntarily paid by the maker; and that the defendant had no right or authority to receive the money as the agent of Lee. The retention of $50 of the amount was therefore without a shadow of right.

Accusations 6, 7, and 8 relate to the same matter and may be considered together. Olivia Grobel was an unmarried Norwegian woman about forty years old, who had for a great many years been employed as a house servant. She was ignorant, being unable to write either her own language or English. She could not read English, nor could she read Norwegian except in print. During the winter of 1908 and 1909, she became unduly intimate with one Ole E. Amunrud under promise of marriage, and, he having later abandoned her, she sought counsel of the defendant in his law office. She finally placed the matter in his hands and paid him a fee of $90 in advance. As soon as the defendant secured the money, he had his client swear to an information accusing Amunrud of the crime of seduction, a warrant was thereupon issued, and Amunrud was arrested and taken before the justice who issued it. Johnson and Miss Grobel were there soon after, and Johnson talked with Amunrud about the charge made against him. The information was then read to Amunrud, and he pleaded guilty to the charge and was held to the grand jury; his bond being fixed at $1,000. A mittimus was then made out and given to the sheriff. Almost immediately after these proceedings, and while the sheriff and Amunrud were still in the justice office, Johnson caused an original notice in a suit of Olivia Grobel against Ole Amunrud, claiming $5,000 for breach of promise, to be served on the latter. After the service of this notice, and while the parties were still in the office of the justice, this defendant and the defendant in the seduction case had a conversation about the matter, in which Johnson said that Amunrud had better settle the matter; that, if he did not,

he would have to go to jail and before the grand jury and perhaps to the penitentiary. Johnson then requested Amunrud to go to his office and fix the matter. Amunrud went to Johnson's office, where he was told by Johnson that, if he settled Miss Grobel's claim, the criminal proceedings against him would be dismissed, and, if he did not settle, that he would have to go to jail and the penitentiary. Amunrud then executed a note in favor of Miss Grobel for $1,000 and secured the same by a second mortgage on one hundred and forty-eight acres of land worth $6,000; the first mortgage being for $3,000. Amunrud then paid the costs of the criminal proceedings, and a dismissal thereof was entered by the justice. Johnson induced Miss Grobel to indorse the note in blank, and he retained it. The mortgage was at once recorded; Miss Grobel paying the fee therefor. About a week after that, Johnson procured Miss Grobel's signature to a paper which he afterwards claimed assigned $500 of the $1,000 to him. About two weeks after that transaction, Amunrud went to Johnson's office for the purpose of securing a reduction of the amount he was to pay Miss Grobel on condition that he pay at once. Johnson sent for Miss Grobel, and she went to his office. He advised her to settle for $700 in cash, and she finally agreed to do so. Amunrud paid the money. Johnson kept $500 of it and gave Miss Grobel $200. The net result of the settlement of this ignorant Norwegian woman's claim against Amunrud was that she received less than $110 and Johnson received $590. The accusations against the defendant in connection with this whole transaction are: First, extortion, coercion, and deceit in taking from Miss Grobel $600 for his services as her attorney; second, the use of the criminal arm of the state to force the payment of a civil claim; and, third, the compounding of a felony. All of the three accusations have ample support in the evidence, as we have already shown. Suffering from the wrong that Amunrud had done her, Miss

Grobel relied upon the professional skill and honesty of the defendant and was completely under his control. That he grossly abused her confidence is manifest. He practically forced her to accept $700 for a note of $1,000 well secured and then compelled her to accede to his extortionate demand for $500 of that amount in addition to the $90 that she had already paid him. That Johnson had the criminal charge made against Amunrud for the purpose of forcing the payment of civil damages and for no other purpose is very evident. It was a prostitution of the criminal arm of the law for personal financial gain, and it needs no citation of authority to sustain its condemnation. Johnson was also clearly a party to an implied agreement not to prosecute the criminal charge for seduction in the event of a satisfactory settlement of the civil suit, and such an agreement was illegal. Code, section 4889; *Baird v. Boehner,* 77 Iowa, 622.

Both of the other charges against the defendant that were sustained accused him of extortion. We think both accusations are sustained by the evidence, and deem it unnecessary to give the details of the transactions. No serious or difficult legal questions are involved in this appeal. The duties and responsibilities of attorneys who have been admitted to practice in the courts of this state are well understood by the profession. It is also well known that one of the very essential requisites for admission to the bar and for continuance as one of its members is the possession of good moral character. *State v. Mosher,* 128 Iowa, 82. The relation between an attorney and his client must necessarily be one of great confidence, and an attorney who knowingly abuses the trust and confidence placed in him by his client is unfit for the profession and unworthy of a place therein. An attorney will not be permitted to oppress his client by an abuse of his relation to him, nor can he have the advantage of an unconscionable contract thus obtained. *Bolton v. Daily,* 48 Iowa,

348. And contracts between attorney and client will be closely scrutinized, and, unless they are shown to be fair and just, they will not be enforced. *Shropshire v. Ryan,* 111 Iowa, 677.

The contracts under which the defendant seeks to justify his charges· were obtained from clients who were unable to, and never did, understand them, and who signed them only because of their confidence in the defendant as their attorney. The contracts were unjust and afford the defendant no protection, and without them there is not even a shadow of justification for the sums demanded and received. The judgment of the district court must be affirmed.

The state filed an amended abstract which the appellant moves to strike because it was unnecessary. The appellant's abstract contains three hundred and forty-five pages exclusive of the index, and it is a fair abstract of the evidence. The amended abstract contains four hundred and thirty-four pages, the greater part of which is devoted to a repetition of the matter contained in the original abstract, varied a little in form, and unnecessarily inserting questions and answers. The motion to strike is overruled, but four hundred pages of the amended abstract will be taxed to the county of Winneshiek.

The judgment is *affirmed.*