SUPREME COURT OF ARIZONA
En Banc

| | |
|---|---|
| In the Matter of the Application of | ) Arizona Supreme Court |
| | ) No. SB-03-0152-PR |
| | ) |
| LEE KELLER KING, | ) |
| | ) **O P I N I O N** |
| Applicant. | ) |
| _____ | ) |

**APPLICATION DENIED**

_____

OSBORN MALEDON P.A.                                          Phoenix
      By    Mark I. Harrison
            Daniel L. Kaplan
Attorneys for Lee Keller King


STATE BAR OF ARIZONA                                         Phoenix
      By    Robert B. Van Wyck, Chief Bar Counsel
            Patricia A. Sallen, Senior Bar Counsel
Attorneys for Amicus Curiae State Bar of Arizona

_____

**T I M M E R**, Judge

¶1      This court recently denied the application to practice law submitted by an individual previously convicted of first-degree murder. *In re Hamm*, 211 Ariz. 458, 123 P.3d 652 (2005). In the wake of *Hamm*, we review the recommendation of this court's Committee on Character and Fitness to admit Lee Keller

King, who was previously convicted of attempted murder. Because King has failed to satisfy his burden to demonstrate his character and fitness to practice law in Arizona, we reject the Committee's recommendation and deny King's application.

**BACKGROUND**

¶2 In 1977, twenty-four-year-old Lee Keller King was a certified peace officer, employed as a reserve deputy constable in Harris County, Texas. In that capacity, King served civil court papers, performed patrol duties with full-time officers, and attended numerous hours of basic training. King was authorized to carry a handgun while in uniform and, when dressed in civilian clothes, was permitted to keep the weapon in the glove compartment of his car.

¶3 On December 30, 1977, King was upset because he had been "passed over" for a full-time deputy constable position. While off duty[1] and out of uniform, King went to a neighborhood bar, became highly intoxicated, and argued with two male acquaintances who King knew to be convicted felons. Although

---

[1] Police reports indicate that King was suspended from his duties at the time of the shootings. King contends the Constable's office altered records to misrepresent this fact. He cannot recall the reason given for his purported suspension, and the record does not enlighten us on this point.

reports about what occurred next conflict somewhat,[2] it is undisputed that King left the bar in the early morning hours of December 31, and the two men soon followed. King then used his semi-automatic service weapon to shoot each man several times at

---

[2] Barry O'Brien, a security guard who witnessed the shootings, told police he drove up to the scene and saw King outside the bar. When King saw O'Brien, whom he knew as a fellow reserve officer, King pulled a gun from his belt and threatened to shoot O'Brien. At that moment, the two victims left the bar, said something to King, and King shot them. King then got into his car before O'Brien ran over, ordered him out at gunpoint, and told King he was under arrest. While still seated in the car, King attempted to shoot himself, but the gun chamber was empty so it did not fire, and King threw it from the car. He next pulled out a knife and inflicted superficial cuts on his leg and throat before throwing the knife from the car. King then left the car and was handcuffed.

A bar employee told police that King was upset about a work-related issue. After one victim told King to stop bothering him, King left the bar but soon returned and pounded on the door, which had been locked after his exit. When one victim and another man looked outside, they reported that King was at the door with a gun. The victims and possibly another man then walked outside to take the gun from King, who shot the victims.

One victim interviewed at the hospital on the morning of the shootings told police that the incident started with name-calling, that neither he nor the other victim was armed, and that the shootings were "unprovoked."

According to King, he left the bar with the intention of going home. When the two men soon followed, King felt threatened, pulled his gun from the glove compartment, and shot the men in a panic as they approached. Although he does not recall attempting to shoot himself, he remembers cutting himself with the knife in an act of self-hatred for his deed. King does not recall seeing O'Brien before the shootings, does not recall events as described by O'Brien or the bar employee, and does not

---

- 3 -

close range, emptying his fully loaded weapon and firing some bullets through the bar door. Neither King nor any other witness reported that King warned the victims to stay back before shooting them. One man was shot in the upper thigh and back, with an exit wound through the neck, leaving him in a critical condition that required surgery. The other man was shot in the abdomen and upper leg, splintering the bones and causing serious damage. Both victims were unarmed. Despite sustaining serious wounds, both victims survived.

¶4 After the State of Texas indicted King on two counts of attempted murder, King entered a guilty plea to one count of attempted murder pursuant to a plea agreement. In September 1978, King was sentenced to a seven-year prison term. After an unsuccessful appeal on bases King cannot recall, he began serving his sentence in June 1979 before the court suspended his sentence and placed him on probation four months later.[3] During

recall why he argued with the victims or felt threatened by them.

[3] Under Texas law in 1979, a court could suspend execution of sentence after a qualified defendant had served a short portion of a prison term. *Cross v. Metcalfe*, 582 S.W.2d 156, 157 n.1 (Tex. Crim. App. 1979) (Roberts, J., dissenting). The purpose of such "shock probation" programs was to "stun the probationer with the harsh realities of imprisonment, then release the probationer into society with a strong impression of the consequences of crime." Shaun B. Spencer, *Does Crime Pay – Can Probation Stop Katherine Ann Power from Selling her Story?*, 35 B.C. L. Rev. 1203, 1214 n.123 (1994) (citing Arthur W. Campbell, Law of Sentencing 100, 112 (2d ed. 1991)).

- 4 -

his term of probation, King underwent mental health counseling and group therapy. In February 1985, a court set aside King's conviction.

¶5 After King left the criminal justice system, his life took an admirable turn. He graduated from college and law school and passed the Texas bar examination. The Texas Board of Law Examiners concluded that King possessed the requisite good moral character to practice law in Texas, and he was admitted to practice in 1994. Thereafter, King practiced law in Texas without incurring any disciplinary charges, he married, adopted his wife's child, and the couple had two additional children.

¶6 In 2003, King moved to Arizona to work in his law firm's Phoenix-area office. He passed the Arizona bar examination and submitted his Character and Fitness Report to the Committee on Character and Fitness[4] as required by Arizona Supreme Court Rule 34(a), 17A Ariz. Rev. Stat.[5] After conducting

---

[4] The Committee on Character and Fitness, which consists of both lawyers and nonlawyers, screens applicants who have passed the Arizona bar examination to determine whether they possess the requisite character and fitness to practice law in Arizona. Ariz. R. Sup. Ct. 33(a), 34, 36. Based on its findings, the Committee then recommends to this court whether applicants should be admitted, conditionally admitted, or denied admission. *Id.* 36(a)(4).

[5] Effective December 1, 2005, the court amended Rules 34 through 37, which delineate the requirements for admission to

an evidentiary hearing on October 14, 2003, the Committee recommended that this court deny King's application for admission, finding that he had failed to prove his good character and fitness to practice law in Arizona. The Committee concluded that although King had presented strong evidence of rehabilitation and positive social contributions since the shootings, the Committee was unable to overlook the seriousness of his crime. This court declined King's subsequently filed petition for review on April 19, 2004, effectively denying King's application.

¶7      King re-applied for admission six months later and another hearing was held on April 21, 2005. The landscape of this hearing differed from that of the prior hearing. Specifically, membership in the Committee had changed, King had secured legal representation, and King presented more extensive evidence concerning his character and fitness to practice law. By a vote of eight to three, the Committee recommended King's admission to the bar and notified the court of its decision by

the Arizona bar. *Hamm*, 211 Ariz. at 461 n.3, ¶ 12, 123 P.3d at 655 n.3. Because King filed his second application for admission before that date, we evaluate that application under the version of the Rules in effect before the amendment. *Id*.

letter four days later.  The Committee offered no explanation for its decision.[6]

¶8    Pursuant to Rule 33(a), this court, on its own motion, continued consideration of King's application and has since considered the record of all Committee proceedings as well as the written and oral arguments presented in this court by King and the State Bar of Arizona, which appeared as amicus curiae in opposition to the application.  Although we seriously consider the Committee's recommendation, we independently decide whether King possesses the requisite character and fitness to gain admission to practice law in Arizona.  *Hamm*, 211 Ariz. at 462, ¶ 15, 123 P.3d at 656.

**ANALYSIS**

**I.**

¶9    King bears the burden of proving by a preponderance of the evidence that he possesses the requisite character and fitness qualifying him for admission to the Arizona bar.  Rule

---

[6]    The Committee is required to make findings of fact only if it recommends against admission or recommends admission with conditions.  Rule 36(f)(7).  If the Committee recommends admission, it is merely required to place its decision "in writing," as it did by letter in this case.  *Id*.  Because the Committee had fully explained its recommendation against admission in 2003 through findings of fact, however, an explanation of its reversal of position would have been helpful.

36(a)(3), (f)(5).[7]  To satisfy this burden, King must prove, among other things, that he presently possesses good moral character.  Rule 34(c)(1)(B); *Hamm*, 211 Ariz. at 462, 463, ¶¶ 12, 17, 123 P.3d at 656, 657.  As we explained in *Hamm*, although an applicant's conviction for a serious crime does not constitute a per se disqualification to practice law,[8] it adds weight to the applicant's burden of proving present good moral character.  211 Ariz. at 462, 463-64, ¶¶ 16, 21, 123 P.3d at 656, 657-58.  Specifically, because past serious misconduct may indicate flaws in an applicant's present moral character, the applicant must initially demonstrate complete rehabilitation before we consider other evidence of present good moral character.  *Id*. at 463-64, ¶¶ 17, 21, 123 P.3d at 657-58 (citations omitted).

¶10    In summary, when an applicant convicted of a serious crime applies to practice law in Arizona, we conduct a conditional, two-part inquiry.  We first consider whether the

---

[7]   Rule 36(f)(2)(E) currently requires an applicant to prove character and fitness by clear and convincing evidence.  Order Amending Rules 32-40, 46, 62, 64 and 65, Rules of the Supreme Court, Ariz. Sup. Ct. No. R-04-0032 (June 9, 2005).

[8]   The State Bar argues strenuously for a per se rule of disqualification for applicants who previously engaged in serious criminal misconduct.  As we stated in *Hamm*, however, the court has never imposed such a bright-line rule, and we continue to adhere to the principle that each case deserves scrutiny on its own merits.  211 Ariz. at 462, ¶ 16, 123 P.3d at 656.

applicant has satisfied the burden of proving complete rehabilitation from the character deficits that led to the commission of the crime. If not, our inquiry ends and we will deny the application. If the applicant proves complete rehabilitation, we then decide whether the applicant has otherwise demonstrated present good moral character. With these principles in mind, we turn to King's application.

## II.

¶11 The weight of the added burden of demonstrating complete rehabilitation is determined by the gravity of the past criminal conduct. *Id*. at 464, ¶ 22, 123 P.3d at 658. The more serious the unlawful act, the greater the burden. *Id*. "[I]n the case of extremely damning past misconduct," such as first-degree murder or, in the circumstances here, attempted murder, "a showing of rehabilitation may be virtually impossible to make." *Id*. (quoting *In re Matthews*, 462 A.2d 165, 176 (N.J. 1983)). Undoubtedly, King's act in shooting two unarmed men at close range multiple times without apparent verbal warning constitutes the type of "extremely damning" misconduct that mandates an extraordinary showing of rehabilitation. Although neither victim died, King inflicted serious injuries upon them

while holding a position of public trust as a peace officer.[9] *See Barlow v. Blackburn*, 165 Ariz. 351, 357, 798 P.2d 1360, 1366 (App. 1990) (recognizing society demands much from law enforcement officers as state "entrusts them with power to enforce the laws upon which society depends"); *Seide v. Comm. of Bar Exam'rs of the State Bar of Cal.*, 782 P.2d 602, 604 (Cal. 1989) (finding applicant's criminal history "all the more reprehensible [because] committed by a former law enforcement officer and law school graduate").

¶12     The extraordinary showing required of King affects the quantum of evidence required to satisfy the preponderance-of-the-evidence standard rather than the burden itself.  Phrased differently, King's misconduct tips the scales against admission

---

[9]     Our dissenting colleague takes issue with our characterization of King's conduct as the type of "extremely damning" misconduct that required the applicant in *Hamm* to make an extraordinary showing of rehabilitation.  The dissent essentially contends that such a rigorous showing should be borne exclusively by applicants convicted of first-degree murder.  *See infra* ¶¶ 43-44.  We decline to rigidly tie the weight of an applicant's burden to the classification of the applicant's crime.  Instead, we elect to examine the unique circumstances of each case to decide the weight of the burden an applicant must overcome.  In this case, the fact that King's victims did not die appears the result of good fortune rather than King's design.  For this reason, and because King committed his crime while occupying a position of public trust, it is appropriate to charge him with the same extraordinary burden borne by the applicant in *Hamm*.

at the outset, thereby requiring him to produce an extraordinary amount or quality of evidence to meet his burden of proof.

¶13     To prove complete rehabilitation, King must establish that he has both (1) accepted responsibility for his past criminal conduct, *Hamm*, 211 Ariz. at 464, ¶ 23, 123 P.3d at 658, and (2) identified and overcome the weakness that led to the unlawful conduct, *In re Arrota*, 208 Ariz. 509, 513, ¶ 17, 96 P.3d 213, 217 (2004).  We "weigh those factors tending to show rehabilitation against those tending to show a lack thereof" to decide whether King has met his burden.  *Hamm*, 211 Ariz. at 465, ¶ 25, 123 P.3d at 659.

**A.**

¶14     Evidence in the record both supports and negates King's contention that he has accepted responsibility for the 1977 shootings.[10]  King demonstrated his acceptance by informing judges, lawyers, law professors, former employers, and a host of friends, acquaintances, and colleagues of his crime over an extended period of time, impressing upon many of them heartfelt

---

[10]  We decline King's request to view his purported suicide attempt and guilty plea as acknowledgments of responsibility for the shootings.  According to O'Brien, King hurt himself only after he had retreated to his car and O'Brien subsequently ordered him from it at gunpoint, thereby suggesting that King was as remorseful about being caught as for shooting the victims.  Additionally, although King pled guilty to one charge rather than proceed to trial, he admitted to the Committee that he did so because he feared convictions on both charges.

- 11 -

feelings of remorse.[11]  And in both hearings before the Committee, King admitted shooting the victims and expressed remorse, calling the shootings "a mistake I made that I will carry with me for the rest of my life."

¶15     Conversely, in his written applications for admission to law school and to the Arizona bar, both created years after his conviction had been set aside, King minimized his personal responsibility for the shootings.  In his application for law school submitted in the early 1990s, King described the circumstances of the shooting and explained that in light of these facts, the lack of any witnesses on his part, his strained emotional state, and anti-police sentiment of the day, it was in his best interests to plead guilty to one charge and "throw [himself] on the mercy of the Court rather than to attempt to clear [himself] in a jury trial."  Although King appropriately stated that he was "stricken with remorse" immediately after the shootings, we are nevertheless left with the impression that King intended his readers to infer that he had a defense to the

---

[11]  It is difficult to determine from the letters of support whether King informed all writers of the shootings or shared details of the shootings with others.  Some letters do not allude to the shootings while others minimize the seriousness of the acts by referring to them, for example, as an "unfortunate event with the law," "past transgressions," and an "infraction of the law."  Additionally, King's employer in 2005 answered "no" when the Committee asked in a mailed form whether the employer was aware of any unlawful conduct by King.

shootings but chose to plead guilty to one charge after weighing his chances for success. His suggestion that only circumstances beyond his control prevented him from mounting a successful defense is inconsistent with the notion of acceptance of responsibility.

¶16    In his application to this court, King provided a shorter account of the shootings, noting his intoxication and fear of the victims, whom he knew to be convicted felons aware of his peace-officer status. He explained that he pled guilty to one charge "rather than attempt to fight [the charges] at trial at a time of major anti-police sentiment in Houston that was caused by the then recent death of a prisoner who had been mistreated by the Houston Police Department." King expressed no remorse, and we are left with the sense that King wanted the Committee and this court to believe he pled guilty only because of prevailing anti-police sentiment rather than as an acknowledgement of actual guilt.

¶17    Finally, King's statements to the Committee suggest he has not candidly assessed his actions on the morning of the shootings. Specifically, although he related details of the crime that support his assertion that he shot the victims in a drunken panic when they approached him, he repeatedly cited a failed memory when asked about facts that dispute that version

of events.  For example, because King claimed no memory of these events, the Committee could not meaningfully question King about witness statements that he threatened to shoot O'Brien and acted as the aggressor by returning to the bar door with his gun.  The Committee was also prevented from probing the basis for King's fear of the victims because he could not remember why he argued with them or why he felt threatened by them.  King's memory of details that only favor his version of the events compels us to discount his claim that he does not remember salient facts about the shootings.

¶18     In light of the above-described evidence, King has failed to make an extraordinary showing that he has accepted responsibility for the shootings.  *Id.* at 464, ¶ 22, 123 P.3d at 658.  Because we weigh all factors tending to show rehabilitation, however, we must examine other evidence concerning King's rehabilitation before deciding whether he has satisfied his burden of proof.  *Id*. at 465, ¶ 25, 123 P.3d at 659.

**B.**

¶19     To prove complete rehabilitation, King must also identify the weakness that caused him to engage in criminal misconduct and then demonstrate that he has overcome that

weakness.  *Arrota*, 208 Ariz. at 513, ¶ 17, 96 P.3d at 217.[12]

King has not proven either factor.

¶20      While before the Committee, King did not explicitly identify the weakness that caused his criminal misconduct. Although he stated that at the time of the shootings he was intoxicated, depressed, and stressed, he never plainly said that this combination of factors caused him to engage in such extreme criminal misconduct.  Indeed, he expressed that he was "not sure anything can adequately explain" what occurred the morning of the shootings.

¶21      At oral argument before this court, King argued that a mix of stress and alcohol abuse caused the misconduct.  The record before us, however, does not reflect that King identified the character flaw that led him to fail to appropriately cope with stress and/or to abuse alcohol.

¶22      King offered no evidence identifying the weakness that prevented him from appropriately coping with the stress he was experiencing in late 1977.  For example, King did not introduce

---

[12]    *Arrota* involved a disbarred lawyer's application for reinstatement, 208 Ariz. at 510, ¶ 1, 96 P.3d at 214, but we do not discern any reason a new applicant required to demonstrate rehabilitation should be relieved from showing that he or she has identified and overcome the weakness leading to the misconduct.  We did not reach this issue in *Hamm* because the holding in that case rested on the applicant's failure to demonstrate present good moral character, independent of rehabilitation.  211 Ariz. at 465, ¶ 26, 123 P.3d at 659.

any evidence from a mental health professional identifying emotional problems King was suffering in 1977 that would explain his inability to appropriately respond to stress or his resort to alcohol abuse. *See Arrota*, 208 Ariz. at 514, ¶ 22, 96 P.3d at 218 (recognizing that in many instances a counselor can assist a person to understand reasons for misconduct). And even though King participated in counseling while on probation, he cannot recall any diagnoses, although he believes he was counseled for depression and "probably" low self-esteem. But many people have low self-esteem, experience employment disappointments, and suffer financial strain without unleashing their emotions in the violent manner chosen by King on the morning of the shootings. King provides no clues as to why seemingly routine stressors caused him to engage in such extreme misconduct.

**¶23** In short, nothing illuminates *why* King lacked appropriate skills to cope with stress or abused alcohol during the pertinent period of his life. Without such knowledge, we cannot be assured that King has appropriately addressed and overcome the weakness leading to his criminal misconduct. *See id.* at 513, ¶ 18, 96 P.3d at 217 (applicant for reinstatement failed to show he understood or even identified cause of misconduct).

- 16 -

**¶24**       King has similarly failed to persuade us that he has overcome the weakness that led to his misconduct. We credit the fact that King has not engaged in serious misconduct or had an alcohol-related incident since the 1977 shootings. This circumstance is particularly significant as King has encountered many stressors since the shootings, including incarceration, probation, schooling, practicing law in Texas,[13] taking on family responsibilities, and experiencing financial difficulties that led to bankruptcy. We disagree with the dissent, however, that the manner in which King has led his life since the shootings, however admirable, compels a conclusion that he has overcome the weakness that led to the shootings. *See infra* ¶ 52. The mere

---

[13]    The dissent contends that we fail to give appropriate weight to evidence that in 1994 the Texas Board of Law Examiners determined that King possessed present good moral character to practice law in that state. *See infra* ¶¶ 34-35. In fact, we do not disregard that fact, but we have no need to address it further as it has no bearing on rehabilitation, which is the basis for our decision. Assuming Texas' current admission rule was substantially in place in 1994, convicted felons were not required to demonstrate rehabilitation, as we mandate in Arizona. *See* Tex. Rules Governing Admission to the Bar, Rule IV(f) (West, Westlaw through 2006) (requiring such applicants to prove that (1) the best interest of the public, the legal profession, and justice would be served by admission, (2) the applicant is of present good moral character and fitness, and (3) during the immediately preceding five years the applicant led an exemplary life). Moreover, King did not provide the Committee or this court with any information that the Texas board considered rehabilitation as a component of present good moral character. Therefore, although the Texas Board's determination might have some bearing on the second prong of our conditional inquiry, it has no bearing on the first.

passage of time without incident is insufficient standing alone to evidence King's triumph over the weakness that caused his misconduct. *Arrota*, 208 Ariz. at 515, ¶ 29, 96 P.3d at 219 ("Merely showing that [an individual] is now living and doing those things he . . . should have done throughout life, although necessary to prove rehabilitation, is not sufficient to meet the applicant's burden.") (citation omitted); *Matter of Robbins*, 172 Ariz. 255, 256, 836 P.2d 965, 966 (1992) (to same effect). Rather, to ensure King's complete rehabilitation before entrusting him with the responsibility of practicing law in Arizona, he must persuade us that he has directly addressed and overcome the weakness that led to the shootings. *Arrota*, 208 Ariz. at 515, ¶ 29, 96 P.3d at 219.

¶25 We give weight to King's testimony that he participated in counseling while in the Texas justice system and during college and law school. According to King, as part of his probation, he underwent weekly individual, and eventually group, counseling sessions, which were designed in part to address his alcohol abuse. He also attended "some meetings of Alcoholics Anonymous," and worked through a twelve-step program designed to overcome addiction.[14] While in college, he again

_____

[14]    Alcoholics Anonymous provides "a program of total abstinence" from alcohol achieved through attendance at group

- 18 -

attended individual and group counseling sessions to help him cope with the stress of being a student. King also attended weekly meetings of Adult Children of Alcoholics during law school. Finally, during his last year of law school and for two years thereafter, he attended weekly counseling sessions with a "master's social work psychological counselor." According to King, this treatment, along with his religious beliefs, increased his sense of self-worth, helped him take responsibility for his actions, and taught him coping mechanisms to deal with stress that do not involve "going out and getting drunk and getting in trouble."

¶26 Other factors discount the positive effects of King's treatment. King provided limited detail about the type or focus of his counseling while on probation and how it assisted him in gaining coping skills or overcoming alcohol abuse. Similarly, King stated that he received "counseling or treatment" at meetings for Adult Children of Alcoholics, but failed to describe that treatment or whether he completed any programs. This lack of detail hinders our ability to assess whether King

---

meetings and by working through twelve suggested steps for recovery from alcoholism. A.A. at a Glance, http://www.aa.org/en_information_aa.cfm?PageID=10 (last visited June 19, 2006).

has directly addressed and overcome the reasons for his misconduct.

¶**27** King also provided contradictory testimony regarding his alcohol abuse. Although he reported that he worked through Alcoholics Anonymous' twelve-step program to help with "addiction," which required him to admit he was powerless over alcohol,[15] he continues to drink alcohol occasionally and denies that he is or was an alcoholic. King's continued, albeit moderate, use of alcohol indicates either he has not overcome the weakness leading to his alcohol abuse or does not believe that alcohol abuse caused the emotional turmoil that led to the shootings. And again, King fails to provide any evidence from a substance abuse specialist or counselor that would enable us to assess whether King has an ongoing addiction so that even social drinking might compromise his ability to practice law. *See In re Beers*, 118 P.3d 784, 788, 791 (Or. 2005) (admitting applicant with criminal record stemming from drug and alcohol abuse based in part on psychologist's testimony that applicant did not suffer addiction). Without this or equivalent evidence, King has not shown that he has truly conquered the weakness that led to his misconduct. Consequently, although the lengthy passage

---

[15] *See* A.A.'s Twelve Steps, http://www.aa.org/en_information_aa.cfm?PageID=17&SubPage=68 (last visited June 19, 2006).

- 20 -

of time without incident and King's participation in counseling provide some evidence that he has overcome the weakness causing his misconduct, the impact of this evidence is compromised by other evidence.

### C.

¶28    In weighing all the factors concerning King's rehabilitation, we conclude that King's demonstration falls short of the "virtually impossible" showing needed to erase the stain of his serious criminal misconduct. Although significant and commendable evidence shows rehabilitation, contrary evidence dilutes its strength. For this reason, we deny King's application for admission to the bar. In light of our decision, we need not consider whether King has otherwise proven his present good moral character.[16] *Hamm*, 211 Ariz. at 465, ¶ 25, 123 P.3d at 659.

¶29    By our decision today, we do not effectively exclude all applicants guilty of serious past misconduct from practicing law in Arizona, as the dissent suggests. *See infra* ¶ 32. Nor do we lightly view the choice of applicants such as King to live

---

[16]   We acknowledge and appreciate the support from King's colleagues, friends, and acquaintances detailing King's laudable activities in his church and the community at large. Because this evidence concerns the second prong of our conditional inquiry, however, which we do not reach due to King's failure to prove complete rehabilitation, we do not consider this evidence in denying King's application. *See supra* ¶ 10.

as good citizens after paying for past misdeeds, as the dissent implies.  Indeed, it is out of respect for and belief in rehabilitation that this court has refrained from mimicking other professions by drawing a bright-line rule to disqualify convicted felons from practicing law in Arizona.  *See infra* ¶ 30.  Such applicants, however, must overcome the additional burden born from their past misdeeds as reflected in our two-part inquiry.  King has not done so.

_____
Ann A. Scott Timmer, Judge*


CONCURRING:


_____
Ruth V. McGregor, Chief Justice


_____
Rebecca White Berch, Vice Chief Justice


_____
Michael D. Ryan, Justice

*The Honorable W. Scott Bales recused himself; pursuant to Article VI, Section 3 of the Arizona Constitution, the court designated the Honorable Ann A. Scott Timmer, Judge of the Arizona Court of Appeals, Division One, to sit in this matter.


**H U R W I T Z**, Justice, dissenting

¶**30**      The State Bar of Arizona has repeatedly urged us to disqualify from the practice of law all applicants with records

of serious past misconduct.  Such a bright-line rule would hardly be irrational.  Felony convictions disqualify applicants from participation in a number of other professions, including law enforcement, Ariz. Rev. Stat. ("A.R.S.") § 13-904(F) (2001), certified public accounting, A.R.S. § 32-741(A)(1) (2002), nursing, A.R.S. § 32-1632(2) (Supp. 2005), private investigation, A.R.S. § 32-2422(A)(3) (2002), and security, A.R.S. § 32-2612(A)(3) (2002).

¶**31**     Our opinions, however, have twice expressly rejected the Bar's suggested per se approach.[17]  In *In re Hamm*, we stated that "the rules and standards governing admission to the practice of law in Arizona include no *per se* disqualifications" and that we therefore "consider each case on its own merits." 211 Ariz. 458, 462 ¶ 16, 123 P.3d 652, 656 (2005).  I concurred in that holding, which is entirely consistent with our willingness to consider the readmission of attorneys disbarred after felony convictions upon proof of rehabilitation.  *See In re Arrotta*, 208 Ariz. 509, 96 P.3d 213 (2004) (involving reinstatement application of attorney convicted of mail fraud and bribery).  I also concurred in the Court's conclusion that

---

[17]     We also rejected a per se approach in 2005 when we amended the Rules governing admission.  Order Amending Rules 32-40, 46, 62, 64 & 65, Rules of Supreme Ct., Ariz. Sup. Ct. No. R-04-0032 (June 9, 2005).

despite his admirable post-conviction record, Mr. Hamm had not discharged his difficult burden of demonstrating current good moral character. *Hamm*, 211 Ariz. at 468 ¶ 40, 123 P.3d at 662.

¶32     The majority purports again to reject a per se rule today, stating that, notwithstanding serious past misconduct, an applicant can prove the current good moral character required by Arizona Supreme Court Rule 36[18] for admission to the Bar.  Op. ¶ 9 & n.8.  In practice, however, the Court has adopted the very bright-line rule it purports to abjure.  If Mr. King has not demonstrated rehabilitation and current good moral character, it is difficult for me to conclude that any applicant previously convicted of a serious felony ever can.

## I.

¶33     The majority accurately recites the background facts of this case, Op. ¶¶ 2-7, and I need not recount them here.  But several uncontested facts not emphasized in the majority opinion deserve particular focus.

¶34     Mr. King comes to us with an extraordinary item on his resume – he is a long-standing member of the Texas Bar.  King graduated from law school, took and passed the Texas Bar

---

[18]     This dissent, like the Court's opinion, refers to the version of the rules in effect at the time King filed his application for admission.  Rules of the Supreme Court are cited as "Rule --."

examination in 1994, and was admitted to practice after a formal hearing before the Texas Board of Law Examiners.  Under Texas law, his admission necessarily involved a finding that he was then of good moral character.  *See* Tex. Rules Governing Admission to the Bar, Rule IV(f)(2) (West, Westlaw through 2006) (requiring that an applicant with a felony conviction demonstrate current good moral character as a prerequisite to admission).

¶35     While we are of course not bound by another state's determination that an applicant possesses good moral character, neither should we simply disregard such a finding.[19]  More importantly, the years since 1994 strongly bear out the wisdom of Texas's conclusion.  Mr. King worked for several firms in Texas from 1994 to 2003, specializing in personal injury law. He is in good standing with the Texas Bar and has never been the subject of a disciplinary grievance or sanction.  King belongs to an Inn of Court, an organization emphasizing professionalism

---

[19]    The Court discounts the Texas admission, arguing that it "has no bearing on rehabilitation," but rather only on the issue of King's good moral character.  Op. ¶ 24 n.13.  Rule 36(a), however, makes plain that rehabilitation from past misconduct is a *necessary component* of present good moral character.  *Hamm* is to the same effect, noting that "[r]ehabilitation is a necessary but not sufficient, ingredient of good moral character."  211 Ariz. at 465 ¶ 26, 123 P.3d at 659.  Thus, whatever the differences between Texas and Arizona law, the Texas finding of present good moral character at the very least suggests rehabilitation from past misconduct.

and ethics among lawyers.  He has worked as a paralegal since coming to Arizona and receives high praise from his employers.

¶36    Nor is there a single blemish on King's personal record.  King has had no serious difficulties with the law since 1977.  Indeed, he appears to have been a model citizen in the almost thirty years following his crime.  He is a devoted family man, happily married and successfully raising three children.  He is active in his children's Boy Scout groups and the Chandler Christian Church, where he is involved with a number of leadership groups and charitable programs.  He was similarly active in his church in Texas for an extended period of time.

¶37    King's application is supported by some fifty letters of recommendation, each of which praises King's good moral character and good works.  These letters come from peers, colleagues, supervisors, friends, clients, professors, clergymen judges, and lawyers.[20]  The letters of recommendation are uniformly supportive of King's application, some in glowing terms.  No one appeared before the Committee or submitted a letter opposing King's admission.  King also presented compelling character testimony at the Committee hearings.  Peter

---

[20]    *See Kwasnik v. State Bar*, 791 P.2d 319, 323 (Cal. 1990) ("Traditionally we have accorded significant weight to testimonials submitted by attorneys and judges regarding an applicant's moral fitness, on the assumption that such persons

William Murphy, a professor at the South Texas College of Law, defense counsel for the International Criminal Tribunal, former trustee for the American Inns of Court, and former teacher and moot court coach to King, testified that King's rehabilitation from his past crime was like nothing he had ever seen. Professor Murphy unreservedly recommended King to the practice of law, explaining that he believed King to possess the requisite good moral character and fitness.

¶38	Perhaps most telling is that, after considering all of this evidence at a formal hearing, our Committee on Character and Fitness ("Committee") recommended King in April 2005 for admission to the State Bar.  The Committee did so after hearing from King personally on two occasions; its recommendation is therefore obviously based on a determination that King was credible and had established his rehabilitation.  "[W]e give serious consideration to the facts as found by and the recommendations of the Committee."  *Hamm*, 211 Ariz. at 462 ¶ 15, 123 P.3d at 656.[21]

---

possess a keen sense of responsibility for the integrity of the legal profession.").

[21]	The Committee had recommended denial of a previous application by King in 2003.  The Court correctly does not rely on this previous denial today.  King represented himself before the Committee on that prior occasion, and presented far less evidence than he did in 2005.  Even on that lesser showing, the Committee seems to have concluded in 2003 that King had discharged his burden of demonstrating rehabilitation, finding

**¶39** Notwithstanding this compelling and extraordinary record, the Court nonetheless concludes that Mr. King is not fit to practice law in Arizona. It does so not because it concludes that he currently lacks good moral character, but rather because it believes that King has not sufficiently demonstrated rehabilitation from his 1977 crime. I respectfully disagree.

**A.**

**¶40** The majority denies Mr. King admission to the Bar because he has fallen "short of the 'virtually impossible' showing needed to erase the stain of his serious criminal conduct." Op. ¶ 28. By making the required showing of rehabilitation "virtually impossible," the majority pre-ordains the result. I do not believe, however, that our rules and case law support the application of the "virtually impossible" standard in this case.

**¶41** We have long held that an applicant has the burden of establishing his qualifications to practice law. *See, e.g.*, *In re Greenberg*, 126 Ariz. 290, 292, 614 P.2d 832, 834 (1980). Rule 36(a)(2)(A) provides that prior unlawful misconduct is relevant to the issue of the applicant's current good moral

"strong evidence of the Applicant's rehabilitation." Rather, the 2003 denial seems to have been based on the "seriousness of

character. Rule 36(a)(3) provides that in determining that character, various factors relating to prior misconduct, including its "recency," "seriousness," and "evidence of rehabilitation," should be taken into account. Our rule is thus properly read as requiring more convincing proof of rehabilitation the more serious the prior misconduct: "The added burden becomes greater as past unlawful conduct becomes more serious." *Hamm*, 211 Ariz. at 464 ¶ 22, 123 P.3d at 658. But nothing in the language of the rule suggests that such a showing is, as the Court holds today, "virtually impossible" for *all* serious prior misconduct.

**¶42** The "virtually impossible" language appears for the first time in our case law in *Hamm*. We correctly noted there that an applicant "who is attempting to overcome the negative implications of a serious felony on his current moral character . . . must overcome a greater burden for more serious crimes." *Id.* We then agreed with a statement made by the New Jersey Supreme Court that "in the case of extremely damning past misconduct, a showing of rehabilitation may be virtually impossible to make." *Id*. (quoting *In re Matthews*, 462 A.2d 165, 176 (N.J. 1983)).

---

the crimes" committed by King, an approach that is at odds with this Court's rejection of a per se exclusionary rule in *Hamm*.

- 29 -

¶43    It is important, however, to note that the applicant in *Hamm* had been convicted of the most serious crime recognized under Arizona law – first degree murder – the paradigm of "extremely damning past misconduct." Because Hamm's crime was the most serious our law recognizes, his burden of establishing good moral character was appropriately very difficult. Mr. King, however, was not convicted of first degree murder, but rather of attempted murder. Mr. Hamm killed two people; Mr. King injured two.[22] Our legislature has expressly recognized that attempted murder, while a serious offense, is much less "damning" misconduct than first degree murder. *See* A.R.S. § 13-1105(D) (Supp. 2005) (classifying first degree murder as a class one felony punishable by death or life imprisonment); A.R.S. § 13-1001(C)(1) (2001) (classifying attempted murder as a class two felony); A.R.S. § 13-702(A) (Supp. 2005) (punishing a class two felony with four to ten years imprisonment). The laws of Texas, under which King was convicted, are similar. Conviction for the Texas equivalent of first degree murder results in either a death sentence or life imprisonment, Tex. Penal Code Ann. § 12.31(a) (West, Westlaw though 2005); attempted murder is normally punished by at least two years imprisonment, Tex. Penal

---

[22]   When questioned by police, one of the victims said he was unsure if he wanted to press charges. The victim's views do not

Code Ann. § 12.33(a) (West, Westlaw through 2005), but can lead, as it did in Mr. King's case, to probation after a brief period of shock incarceration, Tex. Code Crim. Proc. Ann. art. 42.12, § 3(a) (West, Westlaw through 2005).

¶44 The majority ignores these substantial distinctions between Mr. Hamm's and Mr. King's past misconduct, simply equating first degree murder with attempted murder as "extremely damning prior misconduct." Op. ¶ 11. I do not believe that the "virtually impossible" test, which is in practice outcome-determinative, should be applied to all prior serious misconduct. Indeed, were that the case, we would not have considered the application for reinstatement in *Arrotta* from an applicant who had committed mail fraud and bribery. *See* 208 Ariz. at 512 ¶ 12, 96 P.3d at 216. Rather, I believe, as I thought the Court held in *Hamm*, that the quality of proof of rehabilitation should increase as the seriousness of prior misconduct increases. In Mr. King's case, the appropriate burden, in light of his serious crimes, is not "virtual impossibility" but rather "an extraordinary showing of rehabilitation and present good moral character." *Hamm*, 211 Ariz. at 468 ¶ 40, 123 P.3d at 662.

**B.**

---

excuse King's criminal conduct, but do suggest that his offense

¶45    Although Mr. King faced a difficult burden in establishing rehabilitation and good moral character, I conclude that he has discharged it.  Rehabilitation, like good moral character, is not a concept susceptible to easy objective measurement.  But surely the most compelling evidence of rehabilitation is the way that King has led his life since his criminal conduct and the first-hand observations of those with whom he has interacted during that period.  Over the course of almost three decades, Mr. King has lived his life in an exemplary fashion on both a personal and professional level, and this is attested to by scores of those with detailed knowledge of his actions.  The record contains no evidence to the contrary.

**1.**

¶46    In concluding that Mr. King has failed to demonstrate rehabilitation, the Court first suggests that he has failed to take responsibility for his misconduct.  I find no such evidence in this record.  As the majority acknowledges, in the Committee hearings, "King admitted shooting the victims and expressed remorse, calling the shootings 'a mistake I made that I will carry with me for the rest of my life.'"  Op. ¶ 14.  The

was less serious than first degree murder.

- 32 -

Committee, which had the opportunity to observe and question Mr. King, obviously believed the sincerity of that statement.

¶47    The majority, however, discounts the Committee's conclusion on several grounds, none of which I find persuasive. First, the majority suggests that in explaining, in a law school application in the early 1990's1990s, why he pleaded guilty to one count of attempted murder, Mr. King somehow attempted to minimize his culpability for the crimes.  Op. ¶ 15.  Read in context, however, the statement in the application was simply a factual explication of the factors that went into a guilty plea – the lack of witnesses, his impaired memory of the event, the likely hostility of jurors to his actions, and the fact that the plea involved dismissal of one count of attempted murder.  The application did not call for expressions of remorse, and I would not penalize Mr. King for not gratuitously offering them. Nothing in his explanation in the application, nor in subsequent descriptions Mr. King has given about his actions and the subsequent criminal justice proceedings, suggests to me that Mr. King is denying responsibility for his actions.  He began to do so by admitting his guilt to the Texas court,[23] and has continued

---

[23]    Indeed, the record suggests that Mr. King understood his responsibility for what he had done, at least in a fundamental manner, well before court proceedings began.  After the shooting, King retreated to his car and tried to kill himself by

- 33 -

to do so repeatedly throughout his career since, most recently in his appearance before the Committee.  Rather than parse a section of a law school application filed fifteen years ago for evidence of lack of remorse, I would rely on the Committee's first-hand observations of the applicant within the last year.

¶48     Nor can I conclude that Mr. King's impaired memory of the events of the fateful evening demonstrate either lack of candor or failure to accept responsibility.  The arrest report makes clear that when apprehended, Mr. King was intoxicated to the point of incapacitation; he was so incoherent that the police officers were unable to read King his *Miranda* rights.  Under these circumstances, his failure to recall every detail of the events is more a demonstration of honesty than evasion.  The majority's suggestion that Mr. King has "selective memory" is again in stark contrast to the conclusions of the Committee members who had the face-to-face opportunity to consider his credibility.

**2.**

¶49     The Court also concludes that Mr. King has failed to identify the weaknesses that caused his misconduct or address those weaknesses.  Again, I am unable to agree.

---

putting the gun to his chin.  After the gun failed to discharge, King took out a knife and proceeded to cut himself.

¶50     Mr. King has consistently recognized that his misconduct was caused by a combination of alcohol abuse and job-related stress.  The majority acknowledges this, but speculates that there was also a deeper "character flaw that led [King] to fail to appropriately cope with stress and/or to abuse alcohol" to which King has failed to admit.  Op. ¶ 21.  The majority condemns King for not submitting evidence from a mental health expert diagnosing this supposed character flaw and attesting to King's triumph over it.  Op. ¶ 22.

¶51     The record, however, indicates that King has undergone counseling, during both his probation and in the years since his absolute discharge, including personal, psychological and alcohol-related sessions.  He has never been diagnosed as an alcoholic or as having a mental health condition requiring further treatment.  I therefore find no warrant for concluding that Mr. King has hidden some character flaw or disease from us or the Committee.

¶52     More importantly, Mr. King's life since 1977 has conclusively demonstrated that he has triumphed over whatever demons led him to commit his crime.  What better evidence can there be to prove an applicant has overcome a weakness than twenty-nine years of consistent, incident-free conduct in stressful situations?  If Mr. King had a continuing problem with

alcohol, surely there would have been some indication of this in the almost thirty years since his crime. If Mr. King had a continuing problem dealing with stress, surely there would have been some indication of this in his more than ten years of practicing personal injury law, a pursuit hardly free from stress.

### III.

¶53     Our goal in ensuring that members of the Bar possess good moral character is to protect the public. *See Matter of Shannon*, 179 Ariz. 52, 77, 876 P.2d 548, 573 (1994). In this case, King's spotless record as a practicing attorney, together with the glowing recommendations of his clients, colleagues, adversaries and judges before whom he has appeared, adequately assures us that the citizens of Arizona would be safe with King practicing law.

¶54     I therefore respectfully dissent from today's opinion. I would accept the Committee's recommendation and admit King to the practice of law. Although the Court today suggests that some hypothetical future candidate with a record of serious past misconduct might someday qualify for admission to the Bar, Op. ¶ 29, I wonder whether the public and future applicants would be better served by adopting the per se approach the majority

opinion purportedly rejects.  If Mr. King's application cannot meet our "non per se" standards, I doubt that any ever will.


_____
Andrew D. Hurwitz, Justice