# IN THE SUPREME COURT OF IOWA

No. 102 / 07-0286

Filed September 21, 2007

**IN THE MATTER OF**
**MICHAEL PATRICK NASH,**

Applicant for the Iowa Bar Examination.

_____

On review of the decision of the Iowa Board of Law Examiners.

Petitioner seeking permission to take the Iowa bar examination requests judicial review of Iowa Board of Law Examiners' adverse decision. **PETITION FOR PERMISSION TO TAKE BAR EXAMINATION GRANTED.**

Mark McCormick of Belin Lamson McCormick Zumbach Flynn, P.C., Des Moines, for applicant.

Thomas J. Miller, Attorney General, and Jeanie Kunkle Vaudt, Assistant Attorney General, for Iowa Board of Law Examiners.

**HECHT, Justice.**

Michael Nash seeks review of the Iowa board of law examiners' denial of his application to take the Iowa bar examination. After holding an evidentiary hearing on the question whether Nash possesses the requisite character and fitness to practice law, the board denied Nash's application. We conclude Nash has satisfied his burden to demonstrate his good moral character and fitness to practice law. We therefore reverse the board's denial of his application and grant his petition for permission to take the bar examination.

## I.  Background Facts and Proceedings.

On February 24, 2006, Michael Nash, a third-year law student at Creighton University School of Law, submitted an application to take the July 2006 Iowa bar exam. Question 32(h) of the application inquired whether Nash had ever been "formally or informally investigated, reprimanded, disciplined, discharged or asked to resign by an employer or educational institution for misconduct, including . . . actions in disregard for health, safety and welfare of others." Nash responded in the affirmative, disclosing in 2002 he was accused of sexually abusing a minor approximately twenty years earlier while he was employed as a Roman Catholic priest in Juneau, Alaska.

Upon receipt of Nash's application, the board initiated an investigation of his moral character and fitness to practice law. *See* Iowa Ct. R. 31.9(1) (2006)[1] ("The Iowa board of law examiners shall make an investigation of the moral character and fitness of any applicant and may procure the services of any bar association, agency, organization, or

---

[1]All references are to the Iowa Court Rules that were in effect at the time Nash filed his application in 2006.

individual qualified to make a moral character or fitness report."). After completing its initial investigation into the sexual abuse allegations, the board notified Nash that his application to take the bar examination had been denied. *See* Iowa Ct. R. 31.11(3).

Nash filed a timely written request for a hearing before the board. He also requested, and the board granted, leave to take the bar examination pending the hearing.[2] The board set a hearing date and appointed one of its attorney-members as the hearing officer. *See* Iowa Ct. R. 31.11(3)(*d*). Following the hearing, the hearing officer prepared a summary of the testimony and exhibits which he provided for consideration by the other members of the board. *See* Iowa Ct. R. 31.11(3)(*h*). The following is a brief summary of the relevant hearing evidence.

Nash was ordained a Roman Catholic priest in May 1980 and assigned to a church in Juneau, Alaska. During his early years as a priest, Nash was primarily involved in youth ministry in the Juneau diocese. In that capacity, Nash organized and led trips outside of Alaska for children in the diocese during the 1980s. Nash arranged the trips to occur during his personal summer vacation time, when he would be traveling to visit friends in the lower forty-eight states. While on the trips, the groups visited tourist sites, cathedrals, amusement parks, and an occasional play or show. Nash used the trips to give the children, many of whom hailed from logging camps, a "crash course" in basic manners, a broader world view, and a larger sense of the church. Nash invited only teenagers on these trips because they were able to take care of their own basic needs. On occasion, Nash piloted an airplane owned by the diocese to facilitate the trips.

---

[2]Nash took the Iowa bar examination in July 2006, but the result has not been published pending our determination of his character and fitness to be a member of the Iowa bar.

Nash admitted he used spanking, tickling, push-ups, and sit-ups as disciplinary techniques during the trips. Nash further conceded he sometimes required the boys to remove their trousers prior to the spanking, tickling, or calisthenics. Nash denied he was sexually motivated in his choices of these disciplinary techniques, but stated he intended the experience to humiliate the children and encourage them to modify the behaviors for which they were disciplined. Nash employed the spankings and calisthenics as disciplinary techniques because as an adolescent he had experienced similar forms of punishment at a Catholic summer camp.

Nash also admitted that from 1981 to 2002 he often requested or "cajoled" boys under his watch to massage his feet and neck. He typically requested the massages when he was tired from flying, driving, or walking for a long period of time. Nash admitted the massages occasionally may have occurred behind closed doors with only one boy present, but denied any sexual motivation for such conduct. Nash remained clothed at all times during the massages.

The board presented other evidence of alleged improprieties that were denied by Nash. One witness, Tracy Mettler, alleged Nash disciplined him on at least three occasions by spanking his bare buttocks. Mettler claimed his genitals were touched by Nash during these spankings which allegedly occurred in the late 1970s or early 1980s. Nash denies recollection of any contact with Mettler, but admits he occasionally issued bare-bottom spankings to children during that time period. Nash denies ever touching a boy's genitals while administering a spanking.[3]

---

[3]In 2002 a former youth parishioner in Juneau, Joel Post, reported to the Juneau Diocese that Nash sexually abused him repeatedly in the early 1980s. Nash steadfastly denied the accusation. The allegations made by Post were investigated by the Juneau Diocesan Review Board over a period of five months. The review board found Post's allegations were lacking in credibility and did not communicate them to the Vatican as part

In 1989, after receiving a complaint by a parent upset about the disciplinary techniques used on her child during a summer trip, the bishop of the Juneau Diocese met with Nash. Nash told the bishop he was experiencing "burn-out" and was considering leaving the priesthood. In lieu of resignation, the bishop and Nash agreed that Nash would undergo an evaluation at a voluntary, long-term, custodial care residential center for Roman Catholic priests. Nash entered, and completed in 1990, a five-month residential holistic health program recommended in the evaluation report. The later stages of Nash's therapy sessions focused on the appropriateness of his disciplinary techniques and the parameters of appropriate pastoral boundaries. The therapist recommended Nash redirect the focus of his ministry in order to become less closely involved with children. The record evidences that Nash complied with this recommendation when he resumed his parish responsibilities.

There are no allegations of improper conduct by Nash after the summer of 1989. In 1995, he was named diocese administrator by his fellow priests. Nash served in this capacity managing the day-to-day activities of the diocese until a permanent bishop was selected and installed in 1996. In July 1999, after taking a two-year sabbatical to earn a Master's degree in theology with an emphasis in Christian ethics from the University of Louvain in Belgium, Nash returned to pastor a parish in Juneau. In 2001, he was appointed vicar general of the diocese and was authorized to take certain administrative actions in the Bishop's absence.

---

of the review board's report that later led to Nash's separation from the priesthood. The board of law examiners does not rely on the Post allegations to support its determination that Nash presently lacks the moral character to practice law in Iowa. Upon our de novo review, we find Post's allegations are not supported in the record, and therefore we assign no weight to them.

In 2002, the Juneau Diocese investigated allegations that Nash engaged in inappropriate conduct with parish youths in the 1980s. The bishop appointed a review board consisting of parishioners to investigate the allegations. Before the review board, as he later did before the Iowa board of law examiners, Nash admitted using the disciplinary techniques described above. Although Nash steadfastly denied his conduct was sexually motivated, the information developed during the investigation was forwarded to the Vatican. On November 18, 2005, Nash was dismissed from the clerical state *ex officio et pro bono Ecclesiae* (for the good of the church).

At the hearing before the board of law examiners, Nash offered testimony of twelve individuals who attested to his good moral character. These witnesses included adults from the Juneau diocese, individuals who went on trips with Nash as youths during the 1980s, the dean and another faculty member from the Creighton University School of Law, and a law school classmate. In addition to the live testimony at the hearing, the board received nearly eighty letters of support for Nash's application.

At the conclusion of the board hearing, counsel for the board of law examiners requested Nash be required to undergo a full sexual abuse evaluation. The hearing officer declined that request, but allowed Nash to supplement the hearing record with an evaluation from a Des Moines psychiatrist, Dr. Michael Taylor. The evaluation was performed and Dr. Taylor opined:

> I find no evidence that Mr. Nash suffers from any diagnosable psychiatric disorder of any sort. Further, I find no evidence that Mr. Nash presents a risk of perpetrating abuse of any type upon any individual, minor or adult. Finally, I find no evidence that Mr. Nash possesses any mental disorder or personality

traits which would, in any way, impair his ability to maintain the moral character and honesty expected of an Iowa lawyer.

After considering the hearing evidence, three members of the board voted in favor of Nash's admission, and three members voted against it.[4] Because the vote was evenly divided, the board declared its earlier decision affirmed by operation of law. Nash has requested our review of the board's determination.

## II. Scope of Review.

This court has exclusive authority to admit persons to the practice of law. Iowa Ct. R. 31.9(1). We therefore review the record de novo. *In re Hanus*, 627 N.W.2d 223, 225 (Iowa 2001).

## III. Discussion.

An applicant for admission to the Iowa bar has the burden to demonstrate he or she "is a person of honesty, integrity and trustworthiness, and one who appreciates and will adhere to the Iowa Rules of Professional Conduct . . . ." Iowa Ct. R. 31.5. The board of law examiners makes an initial determination of the applicant's moral character and fitness, but we have the authority to review the board's decision. Iowa Ct. R. 31.9(1).

We have previously held a bar applicant must demonstrate the requisite moral character and fitness by a convincing preponderance of the evidence. *Hanus*, 627 N.W.2d at 224 (citing *In re Peterson*, 439 N.W.2d 165, 166 (Iowa 1989)). Although we queried in *Hanus* whether it is the applicant's burden to prove character and fitness by a convincing preponderance standard or by a mere preponderance of the evidence, we concluded the burden of proof did not control the outcome in that case

---

[4]The hearing officer and two other attorney-members of the board voted for admission; two lay-members and another attorney-member voted against admission. One member abstained.

because the applicant failed to establish his good moral character even under a preponderance of the evidence standard. *Id.* We conclude a more precise enunciation of the burden of proof is also unnecessary in this case because Nash's proof of his character and fitness satisfies the more exacting convincing preponderance standard.

Those who apply for admission to the bar must demonstrate their honesty, integrity, and trustworthiness. Iowa Ct. R. 31.5(1). We require these character traits of bar applicants because attorneys are put in a position of considerable influence over their clients, whose trust in them must remain inviolate. *See Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Hill*, 540 N.W.2d 43, 44 (Iowa 1995) ("A person acting in a professional role can have a disproportionate influence on those they serve. They owe to the public a solemn duty to use their considerable influence with utmost discrimination. The metes and bounds of propriety in any professional relationship must be observed scrupulously because the professional role is held in trust.") (quoting *Fisher v. Bd. of Optometry Exam'rs*, 510 N.W.2d 873, 878 (Iowa 1994)); *State v. Johnson,* 128 N.W. 837, 839 (Iowa 1910) ("The relation between an attorney and his client must necessarily be one of great confidence, and an attorney who knowingly abuses the trust and confidence placed in him by his client is unfit for the profession and unworthy of a place therein."). Nash's admitted use of questionable disciplinary techniques was deemed by clerical authorities an abuse of his parishioners' trust that led to his removal from the priesthood. The board contends these abuses of trust were so serious that Nash remains unfit to practice law notwithstanding his completion of a treatment program, his many subsequent years of appropriate priest-parishioner trust relationships, and his apology to those harmed by his earlier actions. We disagree.

While we certainly do not condone Nash's disciplinary techniques, we do not believe such noncriminal acts from seventeen (or more) years ago reflect poorly on his present moral character and fitness to practice law. Nash utilized the techniques when he was a relatively young and inexperienced priest dealing with misbehaving teenagers in remote logging camps of southeast Alaska in the 1980s. While those methods of discipline would certainly be considered inappropriate by today's standards, when viewed in the social and historical context in which they were applied, they appear significantly less sinister. Bill Chalmers, a high school teacher in Juneau, testified he used similar techniques during the same era, and did not consider Nash's behavior extraordinary when placed in historical context.

We believe Nash's conduct over the past seventeen years is the best indicator of his present moral character and fitness to practice law. While passage of time between an act of misconduct and submission of an application for admission to the bar alone will usually not be sufficient evidence of present good moral character, *see In re King*, 136 P.3d 878, 885 (Ariz. 2006), we are convinced Nash came to understand certain disciplinary techniques crossed appropriate pastoral boundaries. Following his treatment experience, Nash voluntarily avoided one-on-one interactions with parish children to avoid the appearance of impropriety. In 2006, as soon as the Catholic Church allowed him to speak with anyone involved in its investigation, Nash issued a written apology to the children whom he had improperly disciplined. He has earned and maintained the support, admiration, and trust of nearly eighty individuals who testified and wrote letters supporting his admission to the bar. Nash's testimony at the board hearing reflects sincere contrition for his actions in the 1980s. When

compared with the considerable evidence of his good moral character during the past seventeen years, the decades-old inappropriate but noncriminal acts admitted by Nash are insufficient to support the board's denial of Nash's application to become a member of the Iowa bar.

### IV. Conclusion.

We have a duty to the citizens of Iowa to ensure the practice of law is reserved for individuals who will respect the trust inherent in the lawyer-client relationship. We conclude Michael Nash has established by a convincing preponderance of the evidence he possesses the requisite moral character and fitness for admission to the Iowa bar. We therefore grant his application to take the Iowa bar examination.

**PETITION FOR PERMISSION TO TAKE BAR EXAMINATION GRANTED.**

All justices concur except Wiggins, J., who dissents.

**WIGGINS, Justice (dissenting).**

I respectfully dissent. As late as October 26, 2006, Nash filed a signed document acknowledging the public could consider his prior actions as sexual abuse. In this document, he stated:

> I have come to realize that regardless of my intentions, these forms of discipline were inappropriate; more recently, these forms of discipline have even come to be considered by some to be sexually abusive. Indeed, I have since learned that these and other actions of mine were subjectively experienced as sexually abusive by a few boys with whom I had interacted.

I agree the acts to which Nash admitted to doing can be characterized as sexually abusive.

The majority bases its decision that Nash has the requisite moral character and fitness for admission to the Iowa bar on Nash's conduct over the last seventeen years of his life. But as the majority notes, the last seventeen years occurred after Nash entered a comprehensive five-month inpatient treatment program for the complaints Nash acknowledged could be construed as sexually abusive.

In another signed document, dated October 26, 2006, Nash opines the treatment he received allowed him to understand his actions were inappropriate. In discussing his treatment, he states:

> You should know that some years ago, I participated in a renewal program where I addressed, among many other topics, my dealings with young people. I came to understand it was inappropriate and wrong of me to treat them as I did. I assure you I have not done such a thing for many, many years, nor will I in the future.

Unfortunately, any records of the treatment, diagnosis, or prognosis from that comprehensive inpatient program were unavailable to the board of law examiners or us for review.

Due to the prior admitted allegations and the unavailability of the prior treatment records, the board asked Nash to submit to a comprehensive evaluation to determine if he presents a risk to perpetrate sexual abuse. Nash refused, but instead saw a local psychiatrist, Dr. Michael Taylor, for an opinion on this subject. Although Dr. Taylor is a board certified psychiatrist, the record does not establish that he has special training or certification in the area of sexual abuse. Additionally, Dr. Taylor reached his conclusions after a brief visit, rather than through a comprehensive inpatient evaluation.

Under these circumstances, I do not feel Nash met his high burden to prove by a convincing preponderance of evidence that he has the requisite moral character and fitness for admission to the Iowa bar. However, I would not reject Nash's application at this time. Before making a final decision, I would require Nash to complete the comprehensive inpatient treatment as requested by the board. Consequently, without such an evaluation I am unwilling to take the same chance as the majority to admit him as a member of the Iowa bar.