**In the Matter of Michael P. NASH, Applicant to the Alaska Bar Association.**

**No. S–13405.**

Supreme Court of Alaska.

July 29, 2011.

Mark McCormick, Belin Lamson McCormick Zumbach Flynn, P.C., Des Moines, Iowa, and Fred W. Triem, Petersburg, for Appellant.

Stephen J. Van Goor, Bar Counsel, Alaska Bar Association, Anchorage.

Before: CARPENETI, Chief Justice, FABE, WINFREE, and CHRISTEN, Justices.

*OPINION*

CARPENETI, Chief Justice.

## I.  INTRODUCTION

Based on a negative moral character determination, the Board of Governors of the Alaska Bar Association denied an application to the Alaska Bar.  In particular, the Board found that the applicant—a former priest— was not truthful regarding aspects of his departure from the priesthood, which was clouded by allegations of misconduct.  The applicant appeals, arguing that the Board erred by misstating the record and relying on hearsay evidence and information not in the record.  Further, the applicant claims

that certain members of the Board should have disqualified themselves, and that the overall errors amount to a violation of due process.  Because we agree that there were serious flaws in the Board's decision, we set aside its findings.  Because we have final responsibility and authority to determine the standards for admission to the practice of law in Alaska, we apply our independent judgment to the matter, find the applicant meets the moral character requirements for admission to the Alaska Bar, and direct the Board to proceed consistent with this opinion.

## II.  FACTS AND PROCEEDINGS

### A.  Procedural Posture

On December 3, 2007, Michael Nash, a member of the Iowa Bar,[1] applied for admission to the Alaska Bar.  The Alaska Bar appointed a hearing master, who conducted a hearing assessing Nash's character and fitness.  On August 28, 2008, the hearing master issued a proposed decision to the Alaska Bar Association Board of Governors recommending that the Board conclude that Nash met the standard for character and fitness.

The Board considered the matter at its meeting of October 30, 2008, where Nash's attorney and the Bar Counsel could respond to the Board's questions.  Rejecting the hearing master's recommendation, the Board denied Nash's application on January 9, 2009.

Nash now appeals the Board's denial of his application.

### B.  Facts

#### 1.  Early priesthood

Michael Nash, currently 60 years old, was a priest in Southeast Alaska for the better part of the 25 years between 1980 and 2005.  He was based in larger communities—Juneau and Ketchikan—and often served smaller communities by plane.  During the 1980s Nash often took trips and brought boys along on the trips.  These trips included local travel in Southeast Alaska and more extensive travel to such destinations as San Francisco and Hawaii.

---

1.  *See In re Nash,* 739 N.W.2d 71 (Iowa 2007) (reversing decision of the Iowa Bar Association and permitting Nash to sit for the Iowa bar examination).

Nash had inappropriate contact with some of the boys on these trips. Nash asserts that the contact was horseplay and a form of discipline, but agrees that it was inappropriate in retrospect. Four affidavits from boys on the trips describe Nash's conduct. It involved tickling the boys, having them do calisthenics in their underwear, spanking them, and receiving foot and neck massages from them. The affidavits are not strictly condemnatory though. The affidavit discussing tickling hedged its assessment: "Father Nash never touched my genital area, and did not engage in other sexual activity with me. He also never told me not to mention the tickling to others, and he might not have realized that there was something wrong about it." And six other affidavits or letters from participants indicated that no improper activity was observed on the trips, nor was discomfort felt.

Admitting to the acts and their inappropriateness, Nash stated that the discipline was of the kind he had received as a child at Catholic summer camp. A Juneau teacher who worked with youth at the time of Nash's actions stated that it was then common to discipline children in such a manner. The church looked into the matter and concluded that the behavior was "horse play." Nash said the tickling was used in place of spanking. He claims that he did not receive any sexual gratification from the behavior, but now recognizes that it was inappropriate. A letter from Nash's legal advocate within the church described the behavior as "immature attempts by a very young priest to maintain discipline among teenagers."

### 2. Jemez Springs rehabilitation center

A 1989 complaint related to Nash's behavior put an end to his trips with youth, and resulted in Nash attending a New Mexico retreat and treatment center, Jemez Springs, from January to May of 1990. Although Nash was never told the specifics of the 1989 complaint, based on counseling Nash received and his memory of the trips, Nash asserts that the complaint pertained to conduct along the lines of the other allegations against him—tickling and massages. He had just returned from a trip with youth to San Francisco, which left him feeling burnt-out and unable to control the children with him. Nash attempted to resign from the priesthood after the complaints, but instead the bishop recommended Nash seek counseling at Jemez Springs.

Nash went to Jemez Springs for a three-day evaluation. The evaluation included interviews, psychological exams, and physical examinations. Nash said he did not remember details from this 20–year–old evaluation, but said that he was not aware of any diagnosis of a psychological condition. Rather, the results showed that he was "a physical and emotional wreck." Bishop Michael Kenny of Juneau recommended Nash stay at the facility and take part in a five-month renewal program called "Foundation House." Nash did so.

Father Liam Hoare is a Licensed Professional Clinical Counselor who was the director of Jemez Springs during the time Nash was there. He did not remember Nash specifically, but based on the limited remaining documentation of Nash's time at Jemez Springs, Father Hoare testified about the programs Nash would have participated in, and the history and purpose of the facility generally. In the 1950s and '60s the facility did not offer counseling, and was more of a home for priests who could not function in society. By the time Nash attended the facility, it had changed to essentially a medium-term inpatient counseling facility. Priests came to the facility for "stress-related disorders, personality disorders, mid-life crises, vocational crises, discernment issues regarding whether to remain in the priesthood or not ... [as well as] [s]exuality issues, heterosexual issues, homosexual issues, human sexuality issues, interpersonal relationships."

According to Nash, Jemez Springs had two facilities: one for priests facing allegations of sexual abuse, and another more general retreat. Nash stated that he was at the latter facility. Father Hoare stated that "burnout" was the reason a lot of priests attended Jemez Springs. The five-month holistic renewal program in which Nash participated included emotional, psychological, spiritual, and physical components. One aspect of the

program emphasized diet and exercise. The counseling components included individual and group therapy, art therapy, psychodrama, journal workshops, lectures, and meditation.

The facility kept reports of each participant's progress, but no reports on Nash are still available. Only a cover letter exists, and consistent with the facility's confidentiality policy, the cover letter asks the holder of the report to destroy the report after reading it. The facility itself kept a copy, but closed in 1995, and ultimately the new administration that later took over destroyed all old reports in 2003. When Nash requested the records, the facility rebuffed or denied his request. Nash expected the documents to come up in later litigation, and was willing to have that happen, but the records were gone by the time they were requested. Nash stated that Bishop Michael Kenny, who was then the bishop of Juneau, had destroyed the local diocese's copy, consistent with the requirements of the cover letter. However, contrary to that, one affidavit in the record implied that Nash destroyed the Juneau Diocese's copy of the records. The affidavit was introduced into the record by Nash, because it was background material used in a recent psychiatric exam of Nash. The affidavit is from a church employee who stated that in 1995 Nash had private access to the Diocese's files and an office shredder, and that she (the church employee) noticed manila envelopes containing the reports go missing at that time.

One way or another, the reports of Nash's time at Jemez Springs were destroyed. However, there is evidence supporting Nash's contention that his treatment addressed burn-out, not pedophilia. Father Hoare's testimony indicated burn-out was a common reason priests would attend the facility. Also, the bishop allegedly wrote in Nash's personnel file that Nash was at Jemez Springs "for himself & not because he had ever molested anyone" and made other consistent remarks. A letter from the Archbishop Emeritus of Anchorage confirms, with personal knowledge, that Bishop Kenny considered Nash to be "OK" after Jemez Springs and returned Nash to his prior as-signment. And Juneau's later bishop, Bishop Warfel, testified that when he took over as bishop in Juneau in the 1990s, his impression, based on discussions with Nash and other church officials, was that the allegations against Nash concerned little more than "horse play" and that Nash was at Jemez Springs for issues like burn-out and depression.

Following his five months at Jemez Springs, Nash returned to working as a priest in Southeast Alaska. Father Hoare stated that Jemez Springs aggressively followed all government reporting requirements and would not have recommended a priest return to his regular position if the facility's staff felt the priest constituted a risk to either adults or children.

Nash concluded that his conduct "crossed appropriate pastoral boundaries," and he resolved to "limit [his] contact with young people and not to do it again." The record does not include any allegations that Nash's conduct was improper after his departure from Jemez Springs.

### 3. Sexual abuse allegation

In 1992 "J.P." or his father alleged that Nash had sexually abused J.P. when J.P. was a minor. Nash testified that he immediately denied the allegation, and that Bishop Kenny investigated the matter and found it not credible. It appears the complaint in 1992 was vague and did not allege any specific instances of abuse.

In 2002 J.P. came forward with renewed rape accusations against Nash covering the period from 1979 to 1982, when J.P. was a young boy. J.P. alleged an extended pattern of sexually assaultive conduct over three years during which Nash isolated J.P. on trips (or even sometimes in Juneau).

J.P.'s allegations were made in writing but unsigned and undated. It does not appear that he was ever under oath when making the allegations. J.P. read a prepared statement to a church board reviewing the charges, but there was no opportunity for cross examination.

Nash denied (and continues to deny) J.P.'s allegations. He submitted an affidavit stat-

ing that he "would not have done and *did not do* the things that [J.P.] alleges. . . ." (Emphasis in original.) Nash noted that the Juneau newspaper reported that J.P. said that he had had no memory of the sexual assaults until three years before coming forward, almost 20 years after they allegedly took place. Further, Nash submitted aircraft logs contradicting some of J.P.'s allegations.[2] Nash's aircraft evidence was later confirmed by testimony from a retired Federal Aviation Administration safety inspector.

J.P.'s allegations were turned over to Alaska Special Assistant Attorney General Richard Svobodny, who declined to prosecute Nash.

#### 4. Investigations and Nash's departure from priesthood

After the J.P. allegation, Bishop Warfel, then bishop of Juneau, ordered an investigation. It included, in 2003, a comprehensive report to Warfel, made by the Diocese of Juneau Review Board for the Protection of Children and Young People. The review board considered a rich record, which now forms the starting point for the record before this court. Also, the review board apparently had access to confidential documents, including a police report not part of the record before this court.

The review board found J.P.'s statement to be the only evidence of sexual assault, and noted that Nash had called that statement into question with contradictory evidence. Accordingly, the review board recommended no action be taken on J.P.'s allegation at that time. Similarly, regarding the affidavit suggesting that Nash destroyed files, the review board found that although the affidavit was credible, Nash presented evidence calling the affidavit into question. The review board thus presumed Nash innocent of the alleged misconduct. However, regarding the older tickling and similar behavior (from 13 to 23

years prior and admitted to by Nash) the review board found the behavior to constitute sexual abuse of minors—and that Nash's intent was "relatively unimportant." One of the review board's more detailed recommendations was that the bishop and Nash negotiate an agreement whereby Nash would voluntarily request a "dispensation" from the priesthood.

The above investigation and report were conducted under "pontifical secret." This appears to have prohibited Nash from independently investigating the merits of the allegations against him. Similarly, while Nash was allowed to answer questions from the church's review board, he was not able to present a case or cross-examine witnesses. Only *after* the review board and bishop reached their conclusion did a canonical advocate—the church's version of legal representation—present the Vatican with a brief defending Nash.

About a year after the review board's 2003 report, the church's governance granted the bishop permission to negotiate Nash's resignation. From 2004 to 2005 Nash and Bishop Warfel negotiated Nash's resignation in exchange for Nash receiving retirement pay, severance pay, and medical benefits, and a waiver by both sides of any claims against the other.

#### 5. Conflicts after Nash's resignation request

Complying with the settlement, Nash wrote the Vatican in May 2005 requesting to be relieved from his vows of priesthood. The Vatican responded with a Latin decree (and English translation) that may have granted Nash's request, or may have fired him. The English version of the decree used the terms "dismissal" and "dispensation." Nash claims the Vatican simply accepted his request for resignation—a view supported by a separate assessment by the dean of Nash's law school,

---

2. J.P. alleged that "[b]etween the fall of 1979 and the spring of 1980 I had taken approximately 10 trips in the floatplane with Father Mike [Nash] and on each of these trips I was alone and was molested by Father Mike." Nash submitted mechanical logs showing that the plane to which Nash had access (the Diocese's plane) was not configured as a float plane at that time, but rather had wheels. In the event J.P. was mistaken about the year, or in the event another plane could have been used, Nash provided evidence that neither the Diocese's plane nor any other Juneau plane was in floatplane configuration during the winters, since the Juneau landing pond is frozen in the winter.

Creighton University (a school "rooted in the Catholic tradition" [3]). Later negotiations between Bishop Warfel and Nash led to an agreement condoning the following explanation, stated from Nash's perspective: "I voluntarily requested the Holy See to return me to the status of a layperson. This request was granted by Pope Benedict XVI in November 2005." That statement was drafted by the church, not Nash.

The need to clarify the meaning of the proclamation later came about because Nash filed a defamation suit against J.P. based on J.P.'s rape accusation. The Diocese of Juneau paid for J.P.'s defense in that suit. The result was an October 26, 2006, settlement between Nash and Bishop Warfel of Juneau, in which the parties stipulated how they would characterize the accusations against Nash and his departure from the priesthood.[4] One such characterization was the explanation quoted in the previous paragraph about Nash's departure. In other stipulated language, Bishop Warfel stated that Nash "has never been found ... to have committed any sexual assault upon J.P."; that Nash produced evidence of "unquestioned authenticity" contradicting J.P.'s claims; that the allegations were "insufficiently probable" to warrant further church actions; and that neither Bishop Warfel nor the Diocese of Juneau opposed Nash's application to the bar. For his part, Nash wrote a letter of apology for his inappropriate attempts at discipline and wrote a statement discussing his actions.

In 2007, following his admission to the Iowa Bar, the *Juneau Empire* ran a story, "Court rules former priest can take bar exam, despite allegations." Writing an op-ed in response to the story, Nash used some of the above language. Although the language

had been agreed upon, its use led to a spat between Bishop Warfel and Nash. Bishop Warfel wrote Nash to protest Nash's use of Bishop Warfel's settlement statement, as well as Nash's public characterization of the Vatican's action as accepting Nash's resignation. Bishop Warfel continues to believe Nash has incorrectly characterized his departure from the priesthood.[5]

### C. Proceedings

### 1. Iowa Bar and Iowa Supreme Court

Nash graduated from Creighton Law School in the spring of 2006. Nash applied to sit for the Iowa Bar, where he was initially denied. Thus began a series of probes into Nash's background, first in Iowa and now in Alaska.

As part of the Iowa process, a 2006 psychiatric exam of Nash concluded as follows:

> I find no evidence that Mr. Nash suffers from any diagnosable psychiatric disorder of any sort. Further, I find no evidence that Mr. Nash presents a risk of perpetrating abuse of any type upon any individual, minor or adult. Finally, I find no evidence that Mr. Nash possesses any mental disorder or personality traits which would, in any way, impair his ability to maintain the moral character and honesty expected of an Iowa Lawyer.[6]

In addition to the exam and a subsequent test to assess Nash's honesty during the exam, the psychiatrist reviewed a thick file of background information on Nash, all of which is now in the record before this court.

As further evidence of his character, Nash submitted to the Iowa Bar nearly 80 letters

---

3. Creighton University, About Creighton, http://www.creighton.edu/about/ (last visited June 21, 2011).

4. Nash claimed Bishop Warfel threatened Nash with excommunication if Nash would not settle the defamation claim against J.P., and that this was a motivation for Nash to withdraw.

5. Bishop Warfel's indignation is puzzling since Nash used language Bishop Warfel authorized in a manner authorized by the settlement. Indeed, testifying before the Alaska Hearing Master,

Bishop Warfel had difficulty pointing to what, exactly, Nash had stated incorrectly. And, by the time of the bar inquiry, Bishop Warfel was a bishop in Montana, not Alaska—although the contract between Bishop Warfel and Nash called for only the bishop of *Juneau* to respond to questions from the bar. Further, the settlement between Nash and Bishop Warfel clearly stated that neither the church nor Bishop Warfel opposed Nash's application to the bar.

6. *In re Nash*, 739 N.W.2d 71, 74 (Iowa 2007).

of recommendation.[7] Forty-seven letters were submitted to the Alaska Bar. These letters are compelling. It appears that Nash has been forthright regarding the allegations against him, because most of the letters discuss the sexual abuse allegations, and proceed to document Nash's character comprehensively. The letters are generally impressive in their breadth and depth, and on the whole appear genuinely personal and reflective. Several people with lifelong ties to Nash speak to his trustworthiness and integrity, as do many who have known Nash only during his law career. They present a thoughtful, caring portrait of Nash.

The following are representative of the letters recommending Nash to the bar. Francis Hurley, the Archbishop Emeritus of Anchorage and a former bishop of Juneau, was supportive of Nash's bar application and wrote as a family friend, a supervisor, and a church official—perhaps the only person presenting first-hand knowledge of Nash's early years as a priest. Patrick Borchers, dean of Creighton Law School, was familiar with law and the church, and his professional responsibility included giving references to students so that they may sit for the bar. He discussed the credibility of J.P.'s allegations, the nature of the Diocese of Juneau's settlement with J.P., Nash's departure from the priesthood, and Nash's admitted-to acts, and concluded by supporting Nash's application to the Iowa Bar. Notably, in addition to being someone with experience making moral-character recommendations, Borchers demonstrated an informed perspective on child abuse and the church. Reverend Mark Henslee worked with Nash as a pastor in Southeast Alaska in the 1990s, and attested to the "high moral character, integrity, and maintenance of appropriate boundaries" Nash displayed. Patricia Douglass of the Alaska Public Defender Agency, where Nash worked in the summer of 2005, spoke to his conscientiousness and responsible habits practicing law, his effective work with the community, and his dedication. And Ronald

Volkmer, a professor at Creighton, made a persuasive argument that "[u]ntil a fact-finding body accords Michael Nash due process of law in regard to these charges" Nash should be presumed innocent according to "fundamental notions of fairness."

As noted above, Nash's application to the Iowa Bar was originally rejected. Nash then requested a hearing before the Iowa Board of Bar Examiners. Much of the evidence noted above was addressed before the board. Upon considering all of the evidence, the board was evenly split: Three members favored Nash's admission and three opposed it. Under Iowa law, the split vote affirmed the earlier decision denying Nash's application.

Nash then appealed to the Iowa Supreme Court. As in Alaska, an applicant for admission to the Iowa Bar bears the burden of showing his or her fitness to practice law.[8] Also as in Alaska, the board makes the initial determination of fitness to practice law but the supreme court exercises final authority in the matter.[9] Upon review of the entire record, the Supreme Court of Iowa concluded:

> We have a duty to the citizens of Iowa to ensure the practice of law is reserved for individuals who will respect the trust inherent in the lawyer-client relationship. We conclude Michael Nash has established by a convincing preponderance of the evidence he possesses the requisite moral character and fitness for admission to the Iowa bar. We therefore grant his application to take the Iowa bar examination.[10]

### 2. Alaska administrative hearing

Nash then applied to the Alaska Bar, which held a hearing to consider Nash's character and fitness. Mary K. Hughes was appointed as hearing master by the Alaska Bar. The taking of testimony consumed two full days; 14 witnesses testified. Following the hearing, Hughes issued her decision. She concluded that Nash met the standards for admission to the Alaska Bar.[11]

---

7. *Id.*

8. *Id.* at 74.

9. *Id.*

10. *Id.* at 76.

11. As the dissent notes, below at 40–41, the hearing master's decision contains the statement that "Nash's lack of memory re: the evaluation is not

The hearing master began by noting that the standard for character and fitness, set forth in Alaska Bar Rule 2(1)(d), is that each general applicant for examination shall "[b]e one whose conduct justifies the trust of clients, adversaries, courts and others with respect to the professional duties owed to them. Conduct manifesting a significant deficiency in the honesty, trustworthiness, diligence or reliability of an applicant is a basis for denial of admission." She also noted that "Nash has the burden of demonstrating character and fitness to practice."

The hearing included extensive testimony from Nash and Bishop Warfel, as well as the testimony of witnesses who had known Nash through the span of his lifetime. For example, Mary Jane Cahail, 70 at the time of her testimony, had known Nash since Nash's infancy; recently the two volunteered at a legal clinic. She recommended him as credible, conscientious, and honest. Stephen Schneider, of Friday Harbor, Washington was a friend of Nash's starting in Nash's young adulthood and hosted Nash and youths when Nash's trips from Alaska came through Washington. Schneider found Nash's behavior with children completely appropriate, and entrusted Nash with Schneider's own children. Lee Urban, a law school friend of Nash, testified to Nash's recent character, recommending him to the bar "without any reluctance or any pre condition."

The Alaska hearing record also contained 47 of the letters submitted in the Iowa proceeding, and five specific Alaska recommendations, all uniformly recommending Nash. Nash's own testimony in Alaska was extensive, and concluded with the Alaska Bar Counsel thanking Nash for his candor. At the conclusion of the proceeding, Hearing Master Hughes said to the participants:

I want to thank both counsel, and Mr. Nash. You have been very, very professional.... I can tell you that the professionalism seen here today, is not seen normally at these types of hearings. And, unfortunately, I have some experience in these, and thank you both counsel. Mr. Van Goor, Mr. McCormick, and Mr. Nash, thank you. Your respect for each other and your professionalism is so much appreciated.

As noted above, following the end of the hearing, Hearing Master Hughes concluded that Nash met the character and fitness requirements of the Alaska Bar.

### 3. Board of Governors of the Alaska Bar Association

The Board of Governors of the Alaska Bar Association held a brief hearing on October 30, 2008. During the Board's hearing, Nash's attorney Mark McCormick presented an opening statement and board members proceeded to ask several questions. There were several questions about the destruction of the Jemez Springs records. While noting that the affidavit on that matter was not addressed in the hearing below, McCormick nonetheless addressed the affidavit, pointing out the relevant evidence in the record rebutting it. The Board then pressed McCormick about details from Nash's time at Jemez Springs. McCormick twice suggested the Board directly ask Nash, who participated telephonically, but the Board never acted on that offer. One board member asked about Jemez Springs: "Isn't it true that that was a treatment program for clergymen who molested minors?" and "Isn't that the reason that Father Nash was there?" There were a few other questions, then board members concluded the hearing.

credible and it is unfortunate that the records are not existent." As we note below, however, Nash offered substantial testimony as to the evaluations he underwent, see below at 20–24, and a careful examination of Nash's testimony in the context of the full record shows that the Board's decision misstated the record and leads to the conclusions that (a) it is not clear that there was a discharge report, and (b) if such a report existed, there is no evidence that Nash ever saw it or denied knowledge of it. Moreover, to the extent

that the Board's misstatement rests on the hearing officer's finding, the finding is problematic for the reasons we discuss in our review of the Board's conclusion, including that Nash "discussed the evaluation comprehensively, denied any diagnosis of a psychological disorder, gave information corroborating his statements," and the like. *Id.* at 21. Under these circumstances, we give less weight to the hearing officer's finding on this point.

After the Board's hearing, Nash filed a recusal notice, suggesting that a board member who had questioned him about Jemez Springs should disqualify himself because his law partner represented J.P. in J.P.'s sexual misconduct allegations against Nash. The Board did not disqualify this board member.

Instead, the Board issued a decision on January 9, 2009, denying Nash's bar application. The Board considered three areas of concern—only the last sufficient to deny Nash's application. First, weighing the allegations of sexual misconduct from approximately 25 years prior, the Board found the allegations unsupported by a preponderance of the evidence. Second, addressing whether Nash had destroyed evidence in church files, the Board found the allegation serious but probably not dispositive on its own. Third, looking to candor, the Board felt that Nash was untruthfully incomplete in responding to questions about Jemez Springs, which merited denying Nash's application. Board members had learned from old press reports that Jemez Springs had unsuccessfully treated some priests with sexual disorders, and they were not satisfied with Nash's explanation that he went there for burn-out and more holistic treatment.

Nash appeals the Board's decision. He alleges multiple misstatements of the record and multiple violations of Alaska Bar Rules, which govern such proceedings.

## III. STANDARD OF REVIEW

The Supreme Court of Alaska has final power and authority to determine the standards for admission to the practice of law in Alaska.[12] Accordingly, when a bar applicant appeals a decision of the Board of Governors, we have the authority and obligation to independently review the Board's decision.[13]

Because we generally delegate responsibility to the Board to determine bar admission, we give its decisions deference and ordinarily do not disturb the Board's findings of fact if the Board is in a position to weigh the credibility of a witness or conflicting evidence.[14] Nonetheless, our independent review has full latitude to depart from the Board's recommendations or conclusions—even absent error—and we do not necessarily extend our deference to findings where the Board was not in a position to weigh either the credibility of witnesses or conflicting evidence.[15]

## IV. DISCUSSION

Nash appeals the Board's decision denying his application. He claims that the decision was inappropriately based on hearsay evidence and information outside the record, and that the decision misstated the record. He additionally claims that board members should have disqualified themselves from the process, and that the proceedings denied him due process. In addition to raising errors, Nash asks us to apply our independent judgment and grant his application to the bar.

We agree that the Board's decision misstated the record. Specifically, the sole dispositive finding against Nash—his alleged lack of candor—was based on factual assertions having no basis in the record. Accordingly, we set aside that finding, and we do not find evidence that Nash was untruthful. Further, we consider the Board's concern regarding evidence destruction, and do not find sufficient evidence to support the con-

**12.** *Sullivan v. Alaska Bar Ass'n*, 551 P.2d 531, 533 (Alaska 1976).

**13.** *See id.; accord In re Application of Obermeyer*, Mem. Op. & J., No. S–9002, 2000 WL 34545818, at *2 (Alaska, August 23, 2000); *In re Green–Armstrong*, Mem. Op. & J., No. S–9327, 2001 WL 34818215, at *1 (Alaska, March 28, 2001); *see also In re Simpson*, 645 P.2d 1223, 1226–27 (Alaska 1982) (establishing independent review for disciplinary actions, based on this court's ultimate responsibility to discipline attorneys); *In re Hanson*, 532 P.2d 303, 309 (Alaska 1975) (establishing independent review for decisions of the Commission on Judicial Qualifications, based on this court's ultimate responsibility to discipline judges).

**14.** *See In re Simpson*, 645 P.2d at 1226–27 (disciplinary proceeding); *Sullivan*, 551 P.2d at 534; *see also In re Disciplinary Matter Involving Brion*, 212 P.3d 748, 751 (Alaska 2009); *In re Disciplinary Matter of Friedman*, 23 P.3d 620, 625 (Alaska 2001).

**15.** *See In re Simpson*, 645 P.2d at 1226–27; *Sullivan*, 551 P.2d at 533.

cern. Finally, applying our independent judgment to the extensive record before us, we find that Nash meets the moral character requirements set forth in Bar Rule 2, section 1(d).

### A. The Board's Decision Misstated The Record When Finding Nash To Be Untruthful.

■ Denying Nash's application, the decision homed in on Nash's "inexplicable lack of recollection about the treatment he received [at Jemez Springs] or the contents of [its] report." The decision found Nash had given misleading answers and therefore lacked candor. As support to show that Nash was not telling the truth about Jemez Springs, the decision pointed to a statement by Nash's attorney, asserting that the attorney admitted "that the facility was notorious as a treatment facility for priests suffering from sexual disorders." Further, the decision stated that it was "well-known to several Board members from reports in the press" that "[t]he facility has been widely criticized as ineffectively returning priests suffering from sexual disorders to active clerical duties." The Board summed up its decision in this way:

> It is uncontested that Mr. Nash received a report upon discharge from the facility. It is also uncontested that the report was destroyed. This report effectively ended Mr. Nash's pastoral career. However, neither Mr. Nash, nor his counsel, claims to have any clue as to the report's contents, conclusions, or recommendations. This lack of recollection lacks credibility and appears to be a deliberate, material lack of candor with this tribunal. It is impossible to fathom that Mr. Nash cannot even generally recall the contents of such a report. It derailed a decadal pastoral career. At a minimum, Mr. Nash would recall the general contents of the report. The report was too vital to Mr. Nash's pastoral career to credibly claim its contents were "forgotten."

The Board stated that this alleged lack of candor was the "most serious concern" and the "key issue" regarding Nash's application.

However, those assertions are simply not supported by the record. Most notably, it is not clear there was any such thing as a discharge report that contained final results. And if such final results existed, there is no evidence that Nash reviewed such a report or denied knowledge of it. The Board's confusion may stem from the multiple reports. Before attending the program at Jemez Springs, Nash underwent an intake evaluation. Then, while Nash attended Jemez Springs, the facility prepared four progress reports. Although the record does not show that a comprehensive "discharge report" was ever prepared, the fourth progress report came at the end of Nash's time at Jemez Springs and may have been considered a final report, although there is no evidence it summarized Nash's progress more comprehensively than the other reports.

Assuming the Board's discussion of a "discharge report" referred to the fourth report, there is no evidence supporting the assertion that Nash received and reviewed that report. And it is not true that Nash claimed no knowledge of such a report—rather, it does not appear Nash was ever questioned on the subject. Indeed, at oral argument Bar Counsel could not point to a single piece of evidence in the record supporting the Board's assertion that Nash received a discharge report, or was questioned about the contents of one.[16] This mistake is extremely prejudicial, since Nash's purported failure to remember the purported discharge report was the basis for finding that Nash lacks candor.

The Board's misstatement may stem from a finding by the hearing master, who found that Nash's lack of memory about the Jemez Springs "evaluation" was not credible. The Board's use of this finding is problematic for several reasons. First, assuming the hearing master was correctly referring to the intake evaluation, the Board's confusion between that and a discharge report is not harmless. That is, it is not clear that the Board could have come to the same conclusion had it known its finding was based on Nash's memory of a preliminary intake evaluation, and

16. At one point, Nash indicated that he was prepared to consent to the release of records from Jemez Springs, but he was not asked to do so.

not, as it believed, on Nash's failure to remember the contents of a comprehensive discharge report which would contain final results from Nash's five months at Jemez Springs. Indeed, the hearing master did not find that Nash's lack of memory warranted denying his application. Second, it is not clear that the hearing master herself was aware of the differing intake evaluation and progress reports. She referenced Nash's testimony about an "evaluation," but then referred to testimony about all of the Jemez Springs records being destroyed, and never mentioned the progress reports that the Board may have intended to reference. Third, even ignoring the above two problems, and assuming the failed memory issue refers to Nash's recollection of the intake evaluation, there is no evidence supporting the Board's contention that Nash "claims to have [no] clue" about that report, or "cannot even generally recall the contents." Bar Counsel conceded this at oral argument before us.

Regarding an intake evaluation that occurred eighteen years prior—at a time when Nash claims to have been depressed and burnt-out—we find his responses to be appropriate. Contrary to the Board's statements, Nash testified extensively. While he did not remember results from certain specific exams, he discussed the evaluation comprehensively, denied any diagnosis of a psychological disorder, gave information corroborating his statements, and attested that the general result showed he was an "emotional wreck" who would benefit from the Jemez Springs program. On direct exam by his own attorney, he testified as follows:

Q: What did you understand you would be evaluated for?

A: It was a—to be a broad based evaluation, including psychological, physical, medical, spiritual, emotional evaluation. Frankly, I was something of a wreck right at that time.

. . . .

Q: How long did it take?

A: It was about three days.

Q: And what was the nature of the evaluation?

A: It included interviews and—let me start over. We were asked to complete a number of psychological written examinations similar to the MMPI. I do not remember all of them. We were evaluated for our— we were asked to complete an evaluation for IQ. We were asked to spend time with a medical doctor who gave us a complete thorough physical examination, including a treadmill test, or gave me, at least. I was asked to spend time with a spiritual director to evaluate my particular spiritual depth and needs at the time. Was there one more component? I was interviewed about my social interactions and activities.

. . . .

Q: Were you given the results of the evaluation?

A: I was.

Q: What were the results?

A: I don't remember. I'm sorry. I know it sounds evasive, but there was—ultimately, there was a recommendation that I participate in a renewal program offered by the Paraclete Fathers at their facility, what they called "Foundation House."

Q: And you said you felt you were a wreck at the time, is that correct?

A: Yes.

. . . .

Q: Now, did you discuss with Bishop Kenny the results of the evaluation that you had had?

A: Well, the results were forwarded to him, and we discussed the wisdom of my trying the renewal program . . . .

Q: Was it your decision to go [to Jemez Springs], or was it Bishop Kenny's?

A: It was my decision to go.

Q: Why did you decide that you would go?

A: He persuaded me that I should give the priesthood another chance, and the results, I think, showed that I was a physical and emotional wreck.

Cross-examination was similar:

Q: In the evaluation process, you indicated that there were a number of evalu-

ations that were conducted. Was one of those a psychiatric or a psychological evaluation?

A: Yes.

Q: Were you informed of the results of either a psychiatric or a psychological evaluation?

A: I got a packet this thick of the results of the various exams. I'm not sure that that was in there.

. . . .

Q: Do you have a recollection of the type of psychological tests that you were given at the Servants of the Paraclete?

. . . .

A: Quite a wide battery. The MMPI, a— I think there were four psychological tests of the type where you answer questions of one sort or another, and a Rorschach.

Q: Do you recall the results of any of those tests?

A: No. I'm sorry.

Q: Did any of those tests reflect a personality disorder?

A: Not to my knowledge. I think I might have remember[ed] . . .

Q: Any psychological diagnosis, such as might be found in DSM–IV?

A: Not to my knowledge.

Q: Specifically, Mr. Nash, in this evaluation process, were you tested for tendencies toward pedophilia?

A: I think so. I think the Rorschach was . . .

Q: I mispronounced that. Pedophilia is what I meant to—how I meant to pronounce it.

A: I know what you mean.

Q: Were there any physical tests for pedophilia that were administered to you . . . ?

A: No.

While the examination of Nash could have been more effective, we do not find his answers particularly evasive, and they certainly cannot be described as the wholesale "lack of recollection" upon which the Board denied Nash's application.

The evidence does not establish that Nash is feigning forgetfulness of a diagnosis. If one assumes that the report contained a specific diagnosis, such as pedophilia, Nash presumably could not forget such a conclusion. But Nash clearly stated that he believes the tests did not point to a specific diagnosis of a personality disorder, or any other diagnosis that might be found in the DSM–IV. Indeed, the testimony is ambiguous as to whether Nash even received the results of each specific test, and does not demonstrate that the tests were of a kind that produces a specific, quotable "result." And even if the results from any of the tests were in the stack of psychological reports Nash received, it is unremarkable that the results phrased in the technical jargon of psychological testing would not produce memorable conclusions for a lay person 18 years later. This comports with Nash's memory, 18 years later, that the results recommended he take part in the Jemez Springs program, and generally concluded that Nash was "a physical and emotional wreck." Based on the bishop's encouragement of Nash to continue as a priest, and Father Hoare's assertion that priests attended the center for burn-out, there is simply no evidence to suggest that the evaluation resulted in a memorable, specific diagnosis of a mental disorder which Nash now pretends to forget.

The Board's decision contains further mischaracterizations. The decision found it "impossible to fathom" that Nash could not remember the details of the alleged discharge report, because that report "derailed" Nash's career as a priest. This is simply wrong. Whether the decision was referring to Nash's intake evaluation, or one of the four progress reports, none of those derailed his career. The reports corresponded with Nash's time at Jemez Springs, which was from January 1990 to May 1990. For the 15 years after that Nash continued his career as a priest. Nash's resignation was negotiated in 2005 after a Diocese report condemned only the tickling and foot massages to which Nash had already openly admitted. There is no evidence that the then 15–year–old Jemez Springs reports led to Nash's resignation, or had any role in it.

The Board's decision also mischaracterized the statements of Nash's attorney, Mark McCormick.[17] The decision stated: "Only upon pointed questioning did Mr. Nash's counsel finally admit that the facility was notorious as a treatment facility for priests suffering from sexual disorders." Again, that is not true. The exchange began with McCormick giving a lengthy description of the holistic programs at Jemez Springs, noting that Father Hoare, the former director, testified that the facility treated more routine issues such as burn-out. McCormick was then questioned by the board member whose partner represented J.P.:

Q: Isn't it true that that was a treatment program for clergymen who molested minors?

A: That was one—that was one thing that could be done there.... But Father Hoare made it very clear that it was in no way limited to that, that was just one of the things that it was appropriate to handle.

. . . .

Q: Isn't that the reason that Father Nash was there? Or, do you deny that that was the reason?

A: We deny that was the issue that he was there for. And Bishop Kenny made a note that did surface in the evidence in this case, that that was not what [Nash] was there for.

McCormick did *not*, under pointed questioning, admit that Jemez Springs was notorious for treating priests with sexual disorders, let alone indicate Nash had been there for that reason.[18]

Instead of pointing to an admission by Nash's attorney, the above questioning demonstrates problems in the Board's analysis. Certainly it demonstrates a disconnect from the record, which was replete with testimony that Nash attended Jemez Springs for more holistic concerns. But more fundamentally the exchange, and the use of the exchange in the decision, demonstrates an

**17.** In addition to mischaracterizing McCormick's statements, the decision asserted that the statements were lies, viewed them as attributable to Nash, and concluded accordingly that the lying was attributable to Nash. As discussed in this section, we find no factual basis for the contention that McCormick lied-in fact, the decision never documented support for its allegation.

Moreover, we find no support for the two legal bases on which the decision attributed McCormick's purported lies to Nash. First, the decision cited Alaska Rule of Evidence 801(d)(2), which pertains to party admissions—but that rule addresses only whether an attorney's statement is inadmissible hearsay, not whether it can be attributed to a client, let alone whether any illicit intention behind the statement can be attributed to the client. Second, the decision cited *Beaulieu v. Elliott*, 434 P.2d 665, 669 (Alaska 1967), to show that admissions of fact are binding on a client. But the Board notably omitted the portion of the *Beaulieu* quotation stating that admissions are binding only "if they are made with the express purpose of dispensing with the formal proof of some fact at the trial." *Id.* With knowledge of the full quotation, *Beaulieu* does not support attributing McCormick's statement to Nash, let alone attributing McCormick's alleged intent. It is also surprising for the decision to redact the statement in the manner it did, given that the decision focused on candor.

**18.** The Board's questioning is further troublesome because the board member was the subject of an unsuccessful recusal request filed by Nash after the above questioning. Nash requested that this board member disqualify himself because his partner represented J.P. in J.P.'s sexual misconduct case against Nash. Alaska Bar Rule 6, section 6, requires board members to "disqualify themselves and withdraw from any case in which they cannot accord a fair and impartial hearing," and Professional Conduct Rule 1.10 imputes an attorney's conflict across the attorney's entire firm.

We have serious concerns about the impartiality of the decision in light of this conflict. It is not difficult to draw a line from the board member's potential outside information to questions such as those above, which occurred during the board meeting and appear not to be based in the record. Indeed, this line is rather apparent in the decision, which credits factual statements about Jemez Springs to board members' outside knowledge, including knowledge gained from newspaper reports.

In a previous case, we concluded that "[a]n impartial tribunal is basic to a guarantee of due process.... When an administrative official has participated in the past in any advocacy capacity against the party in question, fundamental fairness is normally held to require that the former advocate take no part in rendering the decision." *Matter of Robson*, 575 P.2d 771, 774 (Alaska 1978). With approval, we cited the Second Circuit's requirement that administrative hearings should seek not only fairness, but also "the 'very appearance of complete fairness as well.'" *Id.* (quoting *Simard v. Bd. of Educ. of Town of Groton*, 473 F.2d 988, 993 (2d Cir.1973)).

attempt to show that Nash had lied by showing that he had attended Jemez Springs for pedophilia or sexual abuse. This is problematic, because the decision had already concluded that a preponderance of the evidence did not support the allegations of sexual misconduct. It points out the larger logical problem: To conclude Nash was lying, the decision assumed that the reports had special significance, and that Nash had a reason to "forget"—essentially that he was hiding the reports' conclusion that Nash was a pedophile. It is inconsistent for the decision to assume underlying sexual misconduct when the decision had already found that contention unsupported.

Without support in the record for such a contention, the decision reached to an "admission" by Nash's attorney,[19] and even ambiguous "press reports" not in the record,[20] to show that Jemez Springs treated priests with sexual disorders. This type of analysis belies a conclusory slant that is contrary to the record. Moreover, this is a poorly constructed argument as to Nash's alleged untruthfulness. The fact that a portion of the facility treated priests with sexual disorders neither proves nor implies that Nash attended the facility for treatment of a sexual disorder. And without pre-supposing that Nash attended the facility for treatment of a sexual disorder, Nash's answers do not demonstrate the propensity for lying which the Board's decision attributes to him.

Notably, although denying Nash's application based on candor, the decision does not identify a single lie Nash told, nor any contradiction in his answers. It instead appears to rely on Nash's demeanor in testimony that the Board did not hear. This is inexplicable, particularly because the Board declined to question Nash directly when it had the opportunity.

The Board concluded the issue of candor by asserting that since no records exist, Nash must be lying:

> Mr. Nash is likely the only individual alive with direct knowledge and recall of the report's contents. Under these circumstances, his claimed lack of memory is even more damning and incredible.... The Board can come to no other conclusion than there is something in the report that Mr. Nash does not want the Board to learn.

On the contrary, there are other conclusions that could be drawn—the most plausible being that the reports did not contain a memorable diagnosis of a psychological disorder. This is particularly plausible because Nash was willing to have the Jemez Springs reports introduced into the record before he learned that they had been destroyed.

Further, evidence in the record supports the contention that Nash attended Jemez Springs for more benign reasons—that is, he had asked to leave the priesthood because he was suffering burn-out and behaving or disciplining inappropriately—but not that he had received a diagnosis that he was a pedophile. Father Hoare's testimony indicated that burn-out was a common reason priests would attend the facility. Also, the bishop hand-wrote notes in Nash's personnel file indicating that Nash was at Jemez Springs "for himself & not because he had ever molested anyone" and other consistent remarks. A letter from the Archbishop Emeritus of Anchorage, based on personal knowledge, confirmed that then-Bishop Kenny of Juneau considered Nash to be "OK" after Jemez Springs and returned Nash to his prior assignment. And Juneau's later bishop, Bishop Warfel, testified that when he took over as bishop in Juneau in the mid–1990s, his impression, based on discussions with Nash and other church officials, was that the allegations against Nash concerned little more than "horse play" and that Nash was at Jemez

---

19. *See supra* note 17 and accompanying text.

20. We note that reliance on the board members' memories of old press reports—memories that were never mentioned openly in court and which neither party has had the opportunity to review, rebut, or even know—raises serious due process concerns. *See, e.g., City of Fairbanks v. Alaska Pub. Utils. Comm'n,* 611 P.2d 493, 495 (Alaska 1980) (holding that due process confines an agency to the record in order to (1) ensure accurate findings, (2) allow for rebuttal and cross examination, and (3) provide a basis for informed review).

Springs for issues like burn-out and depression. Also, Father Hoare indicated that the facility would not have released a priest who posed a threat to the community. Ultimately, it does not appear there was a specific diagnosis, such as pedophilia, made of Nash, and there is insufficient evidence to support the conclusion that Nash was untruthful by feigning not to remember such a diagnosis in the reports.

In sum, the Board's conclusion that Nash lied because he could not remember a career-ending discharge report—when it is not certain that a discharge report ever existed, when it is not certain that Nash received it if it did exist, and when it is clear that any such report did not end his career—is simply not supported. We set aside that conclusion as premised on misstatements of the record. Applying our independent judgment, we have carefully reviewed the record, including Nash's testimony regarding the intake evaluation and related evidence. Finding no evidence that there was a specific diagnosis, and no documented lies or conflicting testimony, we hold that Nash's alleged lack of memory as to specific results from 18-year-old psychological exams neither evidences a lack of candor nor justifies denying his bar application.

## B. The Single Allegation Of Evidence Destruction Is Not Supported By The Record And Does Not Warrant A Negative Character Determination.

■ The Board denied Nash's application based on the above candor issue. However, the decision also made a separate finding, suggesting that Nash had destroyed evidence. Although the decision stated that this finding was probably insufficient alone to deny Nash's application, we address it as part of our independent review. We agree that the affidavit concerning evidence destruction is insufficient to deny Nash's appli-

cation, and find further that it is not supported by the evidence.

This destruction of evidence claim is based on a church employee's 2003 affidavit, which had been discussed in neither the hearing master's proceeding nor her report to the Board. The employee alleged that Nash had a key to church files and access to a paper shredder while he served as interim bishop during 1995, after Bishop Kenny's death. The employee alleged the files had contained "recognizable" manila envelopes earlier, and no longer contained those envelopes when Nash returned the key. The envelopes allegedly contained records from Nash's time at Jemez Springs.

The affidavit was part of the background material given to the psychiatrist evaluating Nash prior to his Iowa Bar admission. The affidavit is in the record because, perhaps more indicative of candor than a lack of candor, Nash turned over all the background information to the Alaska Bar to show that there was a strong foundation for the psychiatrist's findings—no evidence that Nash suffers from a psychiatric disorder, no evidence that he presents a risk of abusing minors or adults, and no evidence of other disorders or traits unbecoming a lawyer.

Preliminarily, Bar Rule 7, section 4, precludes basing a finding solely on hearsay evidence.[21] Accordingly, without other evidence supporting the alleged destruction of evidence, it is not proper to base a finding on the affidavit alone.[22]

The affidavit does not warrant denying Nash's application. The affidavit is circumstantial evidence, stating that the envelopes disappeared while Nash had access. The affidavit rests on the assumptions that particular manila envelopes contained information from Jemez Springs and that the church employee's memory of which manila envelopes were in the church files at the time of Bishop Kenny's death was accurate. No aspect of the affidavit is corroborated, except

21. Bar Rule 7, section 4, provides, in pertinent part:

> Hearsay evidence may be used for the purpose of supplementing or explaining other evidence but shall not be sufficient standing alone to

support a finding unless it would be admissible over objections in civil actions.

22. Because both parties refer to the affidavit as hearsay, we assume, without deciding, that the affidavit is indeed hearsay.

for the fact that Nash filled in as interim bishop. The event described in the affidavit preceded the affidavit by approximately eight years. The employee did not appear and was not subject to cross-examination or questioning before the hearing master.

When the Board brought up the affidavit in oral argument, Nash's attorney noted it had not been discussed below, pointed to evidence tending to show that Bishop Kenny himself had destroyed the files, and pointed out an apparent inconsistency in the affidavit.[23] Despite this, and without any additional information, the Board's decision asserted that the affiant "is reliable" and that "[t]here seems no reason for [her] to lie." We cannot agree. The allegations in the affidavit have not been submitted to the scrutiny we expect of evidence upon which a bar application is denied.

Further, Nash submitted evidence rebutting the affidavit. Supporting the contention that Bishop Kenny destroyed the documents, the record contains the cover sheet to the report, which states: "[These documents] ARE TO BE DESTROYED OR RETURNED TO FR. LIAM HOARE ... WHO WILL SEE TO THEIR DISPOSAL." Corroborating this, Father Hoare testified that standard practice was to destroy the reports, and that he expected Bishop Kenny to have done so.[24] Nash testified that Bishop Kenny told Nash the documents had been destroyed. And Nash's attorney mentioned the testimony of an Alaska attorney who stated that Bishop Kenny had told him (the Alaska attorney) that the documents had been destroyed.[25]

■ Weighing the evidence contradicting the affidavit, the Board's decision called the issue a "tie." We disagree. Even putting aside the question of whether the bar rules allow reliance on the affidavit, and putting aside the untested nature of the affidavit and questions about it, the record nonetheless contains credible evidence suggesting how the reports in question were destroyed, and does not support finding that Nash destroyed the reports.

## C. The Record Supports Approving Nash's Moral Character Application.

■ Bar Rule 2, section 1(d), requires that every applicant to the Alaska Bar "[b]e one whose conduct justifies the trust of clients, adversaries, courts and others with respect to the professional duties owed to them." The rule lists ten situations that trigger heightened scrutiny; three are relevant to Nash's application:

(3) making of false statements under oath or affirmation, including omissions;

(4) acts involving dishonesty, fraud, deceit or misrepresentation; ... [and]

(7) evidence of mental or emotional disorders.... [26]

Assessing these situations, the following factors should be considered:

(1) the applicant's age at the time of the conduct or condition;

(2) the recency of the conduct or condition;

(3) the reliability of the information concerning the conduct or condition;

(4) the seriousness of the conduct or condition;

(5) the circumstances surrounding the conduct or condition;

(6) the cumulative effect of conduct, condition or information;

(7) the evidence of stabilization or rehabilitation;

---

23. The alleged inconsistency was that the affidavit suggested that two priests had identical manila envelopes from Jemez Springs, but McCormick stated that the other priest had not attended Jemez Springs.

24. Because the entity that created the documents required that they be destroyed, it would not necessarily have been inappropriate had Nash, while serving as bishop, destroyed them, and we would not necessarily conclude that destroying the documents in 1995 points to destruction of evidence for a hearing that occurred over ten years later. All the same, Nash testified that he did not destroy the documents.

25. As the issue did not come up below in the Alaska hearings, this evidence was not introduced to the Alaska hearing master.

26. Alaska Bar R. 2, § 1(d).

(8) the applicant's positive social contribution since the conduct or condition;

(9) the applicant's truthfulness in the admissions process; and

(10) the materiality of any omissions or misrepresentations.[27]

Based on these guidelines, we find that Nash has the moral character requisite to practice law in Alaska. We review below the relevant components of this decision, focusing on each of the three situations that trigger scrutiny according to Bar Rule 2, section 1(d).

The first relevant situation is the making of false statements, including omissions.[28] There are two such allegations in the record, one alleging Nash was untruthful with answers about Jemez Springs, and the second contending Nash was untruthful in characterizing his departure from the priesthood. We discussed the first in depth above, and find no support for it. The second is likewise unsupported. Bishop Warfel alleged that Nash improperly characterized his departure from the priesthood as a resignation, when it should have been referred to as a dismissal. But the language Nash used was expressly authorized by a settlement agreement between him and the church and, when testifying, the bishop could not point to inconsistent language used by Nash.[29] Accordingly, we find that the record does not support finding against Nash based on the making of false statements.

The second relevant situation raised in Bar Rule 2 is acts involving dishonesty.[30] This relates to the allegation that Nash destroyed documents. Although destruction of the documents was arguably proper in light of the requirement that they be destroyed, Nash testified that he did not destroy them, and accordingly we address the dispute concerning their destruction. The affidavit containing the allegation is hearsay,[31] on which a finding may not rest, per Bar Rule 7, section 4. Further, as discussed above, the affidavit is not supported by evidence in the record. Finally, the affidavit's persuasive force is weakened under factors set out in Bar Rule 2, including the reliability of the information containing the allegation and the absence of similar allegations.[32] As noted above, we ultimately conclude that the evidence does not support the affidavit's implication that Nash destroyed the files.[33]

██ The third relevant situation concerns mental or emotional disorders.[34] The Board's decision implies that Nash was diag-

27. *Id.*

28. Alaska Bar R. 2, § 1(d)(3).

29. We note also that the language used in the Latin proclamation was in no way certain, and Nash's reading is supported by outside commentators as well as the situation in which his departure from the priesthood came about.

30. Alaska Bar R. 2, § 1(d)(4).

31. *See supra* note 22.

32. Alaska Bar R. 2, § 1(d), factor (3).

33. We consider but decline to remand the affidavit issue to the Board for additional consideration. The affidavit is an insufficient basis on which to deny Nash's application. The only remaining question is whether a remand for further investigation on this issue is in order. We conclude that it is not: At some point, an examination must end, and we believe this is that point. Nash's bar application has been the subject of multiple processes, requiring extensive documentation. We cannot say there is an insufficient record, particularly since we have now reached the level of detail of reviewing a 14–year–old hearsay allegation that was background information for a psychiatrist's evaluation, and the Diocese's own report—both of which declined to conclude against Nash.

We are further persuaded by our decision not to remand in *Matter of Robson*, 575 P.2d 771, 775 (Alaska 1978). There, considering a well-meaning board whose actions nonetheless gave an appearance of impropriety, we decided that "[i]f the ... Board members were in any manner influenced ... there is no way that we can assure the removal of such an effect from their findings." *Id.* at 775–76. We were also concerned about the prejudice a delay would cause. *Id.* at 776. We concluded: "Since, regardless of [actual impropriety], we believe that there is a fatal appearance of lack of impartiality, we decided to for[ ]go [a remand] in order to conclude this matter expeditiously." *Id.* at 773 n. 3. Because the case before us today has raised several irregularities concerning the handling of the case below, we are not persuaded that accuracy, expediency, or public confidence is best served by a remand.

34. Alaska Bar R. 2, § 1(d)(7).

nosed with or treated for sexual disorders, which could be pertinent to Bar Rule 2, section 1(d)(7). However, there is no actual evidence of such a diagnosis. Nash testified that he was not diagnosed. Other evidence corroborates the assertion that Nash's time at Jemez Springs was not due to a specific diagnosis. And, importantly, a recent psychiatric exam of Nash found no evidence that he suffers from a psychiatric disorder, no evidence that he presents a risk of abusing minors or adults, and no evidence of other disorders or traits unbecoming a lawyer.

Of course, there is additional evidence in the record, including an allegation that Nash sexually assaulted J.P. However, multiple tribunals have found those allegations unsupported or insufficient,[35] the Alaska prosecutor declined to prosecute Nash, and no court of law has tried Nash on the charge. The record does not contain evidence to support a finding of Nash's guilt, and we do not presume Nash to be guilty.

There is evidence of inappropriate sexual conduct from the 1980s: Nash has admitted to the tickling, massages, and calisthenics imposed on youth on his trips. Nash has demonstrated contrition for those actions and apologized to those affected. Nash long ago vowed to change his behavior and there are no recent reports of any such activity. Both the Iowa Supreme Court[36] and the Board of Governors of the Alaska Bar Association have reviewed these allegations of misconduct, and neither found the conduct to warrant denying Nash's application. We agree, particularly in light of the factors from Bar Rule 2, section 1(d), including the recency of the conduct, the evidence of rehabilitation, and the applicant's truthfulness regarding the situation.[37]

The record contains positive testimony from many individuals and 52 letters of recommendation supporting Nash's application. These are compelling letters, documenting knowledge of Nash from many perspectives and many points in his life. They recommend Nash as a trustworthy and compassionate person, and as someone possessing the requisite maturity and skills to serve this state as an attorney. This evidence is supported by a psychiatric report on Nash. Further, Nash appears to have been truthful in the application process as evidenced by his disclosures on the application form, his cooperation in having evidence discovered and compiling a robust record, and his candor in providing full information to his many recommenders. The record thus developed is abundant, spanning hundreds of pages. Despite the allegations discussed in depth above—which we find unsupported—the record contains no confirmed instances of Nash lying, committing illegal acts, omitting information, or otherwise behaving dishonestly. Rather, the impression one is left with is of a man who has the support of those who have known and worked with him. It appears Nash had periods of difficulty in his life, but there is evidence of sincere remorse, reflection, and growth, and we do not find evidence of recent inappropriate acts or acts justifying denying Nash's application.

## V. CONCLUSION

Because we find that it was based on misstatements of the record, we VACATE the decision below. Applying our independent judgment and reviewing the entirety of the record before us, we find Nash to have the requisite character to satisfy the requirements of Alaska Bar Rule 2, section 1(d). We ORDER the Board to process Nash's application in a manner consistent with this opinion.

EASTAUGH, Justice, not participating.

FABE, Justice, dissenting.

FABE, Justice, dissenting.

The court today finds Michael Nash to have satisfied the moral character requirement for admission to the Alaska Bar. The court's decision relies in significant part on its conclusion that "the record contains no confirmed instances of Nash lying, commit-

---

**35.** *See, e.g., In re Nash,* 739 N.W.2d 71, 73 n. 3 (Iowa 2007).

**36.** *Id.* at 75.

**37.** Alaska Bar R. 2, § 1(d), factors (2), (7), and (9), respectively.

ting illegal acts, omitting information, or otherwise behaving dishonestly."[1] But like the Board of Governors, we have not heard directly from Nash on the issues in contention in this case. The only finding we have on Nash's honesty is from the hearing master, Mary K. Hughes, who heard Nash testify and found that "Nash's lack of memory re: the evaluation is not credible." Because this court is not well situated to overrule the hearing master's determination of Nash's credibility, I believe that this case should be remanded to the Board for a new hearing that would be free of any of the procedural shortcomings identified by the court's decision.[2]

I agree with the court that the Board's decision cannot be affirmed in light of the flaws in the Board's procedure and the erroneous findings that underpin its decision. But the record before the court does not allow us to conclude with confidence that Nash has met his burden of establishing that he is "one whose conduct justifies the trust of clients, adversaries, courts and others."[3] As the court recognizes, in Alaska, "the applicant [bears] the burden of proving the material facts upon which the applicant relies."[4] Although in disciplinary proceedings the Bar Association must prove the charges of attorney misconduct by clear and convincing evidence,[5] it is the applicant for certification who bears the burden of demonstrating the requisite character to practice.[6] In deciding to grant Nash's application to the Alaska Bar, the court emphasizes the lack of record support for the Board's factual findings that weigh against Nash's admission. There is a significant difference, however, between a record that fails to support the findings of the Board and a record that proves by a preponderance of the evidence that Nash has demonstrated the requisite character required by Bar Rule 2, section 1(d). The court's decision goes beyond identifying the problems with the Board's decision and procedure—it entirely releases Nash from his burden, simply admitting Nash to the Bar despite the existence of serious, unresolved questions regarding his honesty and candor during the application process.

The hearing master found that Nash's lack of memory on a critical issue of fact was "not credible." During its hearing, the Board did not hear testimony from Nash himself, but instead heard only from Nash's attorney. At this juncture, therefore, Nash has only testified before the hearing master, so we are left only with her finding that his purported lack of memory is not credible. "Credibility determinations made by the trier of fact are generally left undisturbed by this court on review."[7] And the hearing master's finding is significant because it relates to Nash's purported lack of memory about his intake evaluation at the Jemez Springs treatment facility. The hearing master's finding that "Nash's lack of memory re: the evaluation is not credible and it is unfortunate that the records are not existent" is relevant to two factors listed by Alaska Bar Rule 2, section 1(d) "as cause for further inquiry" before a decision should be made on the question whether the applicant possesses the character and fitness to practice law: "(3) making of false statements under oath or affirmation, including omissions" and "(7) evidence of mental or emotional disorders." If Nash was not truthful in his testimony before the hearing master, as her credibility finding suggests, this lack of candor could itself constitute "[c]onduct manifesting a significant deficiency in the honesty, trustworthiness, diligence or reliability of an applicant."[8]

Honesty is perhaps the most important attribute of the moral character qualification for bar membership, and an applicant's failure to answer truthfully questions associated

1. Op. at 148.

2. Op. at 143 n. 18.

3. Alaska Bar R. 2, § 1(d).

4. Alaska Bar R. 6, § 3; *see* Op. at 138.

5. *In re Ford*, 128 P.3d 178, 180 (Alaska 2006).

6. *See, e.g., Seide v. Comm. of Bar Exam'rs*, 49 Cal.3d 933, 264 Cal.Rptr. 361, 782 P.2d 602, 604 (1989) (in bank); *In re Bowen*, 84 Nev. 681, 447 P.2d 658, 660 (1968).

7. *Municipality of Anchorage, Police & Fire Ret. Bd. v. Coffey*, 893 P.2d 722, 728 (Alaska 1995).

8. Alaska Bar R. 2, § 1(d).

0

with his or her application to the bar weighs against admission.[9] As the Connecticut Supreme Court explained: "It is not enough for an attorney that he be honest. He must be that, and more. He must be believed to be honest."[10] The hearing master's finding also casts doubt on Nash's assertion that he was not diagnosed with or treated for any psychological or personality disorders at the facility in Jemez Springs.[11]

The court focuses on the Board's mistakes in characterizing the record and concludes that Nash's "alleged lack of candor ... was based on factual assertions having no basis in the record."[12] Yet the Board's finding did have factual support-the hearing master's credibility finding. Moreover, the court relies on its somewhat generous characterization of the facts in the record to conclude that Nash does possess "the moral character requisite to practice law in Alaska."[13] The court, for example, calls the letters submitted to the Iowa Bar "compelling" and "impressive in their breadth and depth" and asserts that the letters make it "appear[ ] that Nash

has been forthright regarding the allegations against him."[14] Thus, the court concludes, remand is unnecessary because of the extensive record that has been developed in this case.[15] I disagree.

Given the posture of this matter, where there were procedural flaws in the Board's hearing and where its findings of fact were not adequately supported by the record, the proper remedy is not simply to admit Nash—any more than it is to deny him admission. Nash must be allowed the opportunity to meet his burden of proving that he satisfies the requirements set forth in the Bar Rules through a meaningful hearing before the Board.[16] Remand is appropriate in this case because of the seriousness of the hearing master's credibility finding and because Nash is entitled to have the Board consider his application in an impartial hearing.[17]

When faced with a similar situation where a decision by the state bar examining committee was not supported by factual findings, a Connecticut appellate court declined to ad-

9. *See, e.g., In re Green,* 464 A.2d 881, 885 (Del. 1983) ("Good moral character has many attributes, but none are more important than honesty and candor."); *In re Stern,* 403 Md. 615, 943 A.2d 1247, 1258 (2008) ("We have emphasized the importance of candor in ... the Bar application process."); *In re Allan S.,* 282 Md. 683, 387 A.2d 271, 275 (1978) ("[N]o moral character qualification for Bar membership is more important than truthfulness and candor."); *Strigler v. Bd. of Bar Exam'rs,* 448 Mass. 1027, 864 N.E.2d 8, 11 (2007) ("An applicant's failure to answer all of the board's questions candidly, both on the application and at any hearing, is a powerful indication that the applicant lacks the good character required for admission to the bar.")

10. *Doe v. Connecticut Bar Examining Comm.,* 263 Conn. 39, 818 A.2d 14, 24 (2003) (quoting *Scott v. State Bar Examining Comm.,* 220 Conn. 812, 601 A.2d 1021, 1026 (1992)).

11. *Municipality of Anchorage, Police & Fire Ret. Bd.,* 893 P.2d at 729 (citing *Innes v. Beauchene,* 370 P.2d 174, 177 (Alaska 1962)) (recognizing that "the witness's demeanor may convince the trier of fact that the truth lies directly opposite of the statements of the witness, especially where the witness is interested in the outcome of the case").

12. Op. at 139–40.

13. Op. at 147.

14. Op. at 136–37. The court also quotes at length from the Iowa Supreme Court's decision that allowed Nash to sit for that state's bar examination. Op. at 137. But it is our responsibility to independently review the proceedings before the Alaska Bar Association to protect the Alaskan public. As we have noted, "[n]o matter how learned in the law [applicants] may be ... [they] can never be admitted to the bar until [they] can satisfy the court that [they] possess[ ] that first requisite to admission to the bar, *a good moral character.*" *In re Buckalew,* 731 P.2d 48, 55 n. 27 (Alaska 1986) (quoting *Ex Parte Thompson,* 228 Ala. 113, 152 So. 229, 238 (1933)).

15. Op. at 147 n. 33.

16. *See In re Peterson,* 459 P.2d 703, 706 n. 7a (Alaska 1969) ("[T]his court will not undertake to review the merits of an appeal until the unsuccessful applicant has been accorded a meaningful appellate hearing before the Board of Governors."); *see also City of Nome v. Catholic Bishop of N. Alaska,* 707 P.2d 870, 876–77 (Alaska 1985) (exercising the court's equitable power to remand portions of the case to an administrative agency to allow a party to submit additional evidence).

17. *See* Alaska Bar R. 6, § 6; *In re Robson,* 575 P.2d 771, 773–74 (Alaska 1978).

mit the applicant to the Connecticut Bar.[18] The Connecticut court held that remand for further factual findings was the proper remedy because the bar examining committee had failed to make findings of fact that were essential to the appellate court's review of the decision.[19] Similarly, in this case Nash must be given a fair hearing before the Board so that the Board can either adopt the factual findings of the hearing master or make its own findings.

On remand, the hearing before the Board could be free of any procedural deficiencies or potential biases identified by the court's opinion.[20] The Board could make further findings of fact, including a finding on Nash's credibility supported by record evidence. Nash would have the opportunity to testify directly before the Board. In addition to allowing the Board to consider Nash's credibility, remand would provide an opportunity for the Board to seek additional evidence to supplement the factual record on the allegations that Nash destroyed relevant documents and to contact the professionals at Jemez Springs who evaluated and treated him there.

Although I share the court's concerns regarding the Board's procedures and the lack of support for its factual findings in this case, I respectfully dissent from the court's decision to apply its independent judgment and admit Nash. I would remand to the Board for a further evidentiary hearing and additional findings by the Board.

---

18. *Friedman v. Connecticut Bar Examining Comm.*, 77 Conn.App. 526, 824 A.2d 866, 877 (2003).

